# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RICKEY DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  03-3007 |
| | ) | |
| JOHN HARRIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendants John Harris and City of Springfield, Illinois' (City) Motion for Summary Judgment (d/e 274) (Motion for Summary Judgment) and Motion to Strike Affidavits of Harris and Davis (d/e 284) (Motion to Strike).  The Plaintiffs are six African American police officers who allege racial employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII) and post-Civil War Civil Rights Acts.  42 U.S.C. §§ 1981, 1983, & 2000e.  <u>Complaint (d/e 1)</u>, <u>Counts I and II</u>.  For the reasons set forth below, both Motions are ALLOWED in part and DENIED in part.  The Court has reviewed the Motion to Strike and the Response (d/e 288), including

1

additional supporting documents, and will disregard those portions of the Affidavits of Defendants Rickey Davis and Ralph Harris that are not competent admissible evidence based on personal knowledge. The Motion for Summary Judgment is DENIED with respect to the following claims:

1.  Plaintiff Rickey Davis' Title VII claims in Count I against the City for: (1) disparate treatment and retaliation based on: (a) the 1996 transfer from Criminal Investigations to Patrol, and (b) the 1997 to 2002 denial of transfers to Criminal Investigations; and (2) retaliation based on: (a) the February 2001 reprimand, (b) the assignment to the third watch as a Lieutenant, and (c) the discipline in August 2002;

2.  Plaintiff Rickey Davis' §§ 1981 and 1983 claims in Count II against Defendant John Harris for disparate treatment racial discrimination based on: (a) the 1996 transfer from Criminal Investigations to Patrol, and (b) the 1997 to 2002 denial of transfers to Criminal Investigations; and

3.  Plaintiff Lea Joy's Title VII claims in Count I against the City for: (a) retaliation based on: (1) the 1996 transfer to

2

the third watch, and (2) the transfer from Internal Affairs

to Field Operations; and (b) hostile work environment.

The Motion for Summary Judgment is otherwise ALLOWED.

## PRELIMINARY COMMENTS

Before discussing the Motion for Summary Judgment in detail, the Court is compelled to note certain matters that have affected this case significantly. The six Plaintiffs may elect, as they have, to join their separate claims in a single action. Fed. R. Civ. P. 20(a). The Plaintiffs have not, however, have taken any of the necessary steps to show that this case should be treated as a class action. See Fed. R. Civ. P. 23. As such, the Court cannot treat the Plaintiffs' claims as a group or class. Each Plaintiff's claims are separate and distinct. At this juncture, each Plaintiff must present evidence to demonstrate that issues of fact exist with respect to each of his or her claims.

Second, the Defendants have waived the affirmative defense of the statute of limitations. The Plaintiffs filed their claims on January 9, 2003. Complaint (d/e 1). They filed their charges of discrimination with the Equal Employment Opportunity Commission (EEOC) on September 9, 2002. E.g., Defendants' Reply to Amended Response to Motion for Summary

Judgment (d/e 290) (Reply), Exhibit 5, Charge of Discrimination by Rickey Davis.   In their Complaint, and in their response to the Motion for Summary Judgment, the Plaintiffs assert claims based on events that occurred as far back as 1978.  As this Court discussed in detail in its Order entered June 10, 2003 (d/e 25) (Order), the relevant statutes of limitations generally limit claims brought under Title VII and §§ 1981 and 1983 to events that occurred within the two years preceding the filing of the lawsuit, or less.  Order, at 23-24.  The Court entered the Order on June 10, 2003, before the Defendants filed their Answer and Affirmative Defenses on July 18, 2003.  Answer and Affirmative Defenses of Harris, City of Springfield Illinois, Pittman, Vasconcelles and Harms (d/e 29) (Answer).   The Defendants were thus aware of the statute of limitations defenses.   The Defendants even argue the statute of limitations in their Reply.  E.g., Reply, at 19-22, 24-29, 32-34, 36, 39-40, 44-45.

The statute of limitations, however, is an affirmative defense that must be pleaded in the answer, or amended answer, or else it is waived.  Fed. R. Civ. P. 8(c).  The Defendants did not plead the statute of limitations as an

4

affirmative defense in this case.  Answer, at 23-25.[1]  The Defendants did not

subsequently amend their pleadings to raise the defense.  "[I]n civil

---

[1]The Defendants pleaded the following defenses:

### AFFIRMATIVE DEFENSES

#### FIRST DEFENSE

All actions by Defendants with regard to Plaintiffs were made in good faith compliance with applicable provisions of law, rules, and regulations.

#### SECOND DEFENSE

Even if it were determined that Defendants discriminated against any Plaintiff such discrimination was not based upon any Plaintiff's race, color, national origin, prior opposition to alleged discriminatory conduct or any unlawful factor.

#### THIRD DEFENSE

Even if it were determined that Defendants impermissibly considered Plaintiff's (sic) race or any unlawful factor in their decision to take employment action with respect to any Plaintiffs, they nevertheless would have taken the same action in the absence of the impermissible motive(s), thus barring Plaintiff's (sic) claims in whole or in part.

#### FOURTH DEFENSE

Even if it were determined that Defendants impermissibly discriminated against Plaintiffs, the actions taken by Defendants did not rise to the level of creating a hostile work environment, thus barring the claims in Count I of Plaintiffs' Complaint in whole or in part.

#### FIFTH DEFENSE

There is no basis in law or fact on which Plaintiffs are entitled to recover damages, including punitive damages, against Defendants.

#### SIXTH DEFENSE

To the extent that Plaintiffs have failed to mitigate their damages, their claim for damages is barred or subject to reduction.

#### SEVENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs failed to comply with the procedure prerequisites for filing suit.

#### EIGHTH DEFENSE

Plaintiffs' claims are barred in whole or in part by the Illinois Tort Immunity Act, 745 ILCS 10/2-201.

Answer, at 23-25.

litigation, a statutory time limit is forfeited if not raised in a defendant's answer or in an amendment thereto. Fed. Rules Civ. Proc. 8(c), 12(b), and 15(a). And we would count it an abuse of discretion to override a [party's] deliberate waiver of a limitations defense." Day v. McDonough, __U.S.__, 126 S.Ct. 1675, 1679 (2006). The Court, therefore, must respect the Defendants' waiver of this defense. Consequently, the Court will consider all of Plaintiffs' claims, not just those that would have survived the bar of the statute of limitations.

The Plaintiffs' pleading decisions, however, have also affected the matters at issue on summary judgment. For example, Plaintiff Rickey Davis presents evidence, discussed below, that he was subjected to a hostile work environment throughout his career, particularly through Caucasian officers' practice of telling "nigger" jokes. Amended Memorandum of Plaintiffs in Opposition to Motion for Summary Judgment (d/e 283) (Response), at 109-10. Davis did not allege in the Complaint that he was subjected to a hostile work environment, and specifically did not allege that he was subjected to racial jokes of any kind. Complaint (d/e 1), at 13-17, 45-47, 75-78. Based on his allegations, this Court previously held that Davis stated claims for disparate treatment and retaliation, but not for a hostile work environment.

Order, at 38, 53.  Davis has had more than three years since the Order was entered to ask for leave to amend the Complaint to add a hostile work environment claim.  Such timely requests are liberally granted.  Fed. R. Civ. P. 15(a).  He did not make the request to amend his claims.[2]  He cannot now attempt to use the Response to amend his claims to add this additional claim.  Speer v. Rand McNally & Co., 123 F.3d 658, 665 (7th Cir. 1997).  Thus, Davis may not proceed with a hostile work environment claim.  Other Plaintiffs have also presented evidence of claims that they did not raise in the Complaint or in any amended pleadings.  They, too, cannot use the Response to amend their claims.

The Plaintiffs also submit evidence of events that occurred after the filing of the Complaint in January 2003.  In order to pursue claims based on events that occurred after the filing of a complaint, a plaintiff must, with leave of Court, file supplemental pleadings that set forth the new claims.  Fed. R. Civ. P. 15(d).  Such supplemental pleadings give the defendant fair notice of the additional claims.  The Plaintiffs did not ask for permission to

---

[2]On September 16, 2003, U.S. Magistrate Judge Byron G. Cudmore entered a scheduling order directing that any motions to amend the Complaint be filed on or before January 5, 2004.  No motions to amend were filed after September 16, 2003, and no motions to extend the time to file motions for leave to amend were filed.

file supplemental pleadings and did not file any supplemental pleadings. The Court cannot now allow the Plaintiffs to proceed on these claims. The Court, therefore, will not consider evidence of claims based on events that occurred after the filing of the Complaint.

Last, the Court notes that each Plaintiff, in responding to the Motion, must present some competent evidence that the Defendants treated similarly-situated, non-minority employees more favorably in order to go forward to trial with claims of disparate treatment in employment. In the case of the retaliation claims, each relevant Plaintiff must present some competent evidence that a similarly-situated individual, who did not speak out against perceived racial discrimination, received more favorable treatment. The parties have had some three years to conduct discovery and have electronically filed the equivalent of more that five reams of paper in connection with the Motion for Summary Judgment. Yet, each Plaintiff, in many cases, has failed to submit competent evidence that relevant, similarly-situated non-minority officers received more favorable treatment. With some exceptions, each Plaintiff has only submitted his or her personal opinion that similarly-situated Caucasian officers received more favorable treatment. These uncorroborated personal opinions are not sufficient to

demonstrate that issues of fact exist.  <u>Fed. R. Civ. P.</u> 56(e); <u>Oest v. Illinois</u>

<u>Department of Corrections</u>, 240 F.3d 605, 615 (7th Cir. 2001).   The

Plaintiffs have had years to discover the relevant personnel and disciplinary

records of police officers who they believe received better treatment, or to

depose those officers, or others, with personal knowledge of the relevant

circumstances, to show that these officers were similarly-situated.   The

Plaintiffs elected not to discover and present such evidence to the Court;

thus, in many cases, the Plaintiffs simply have not presented the evidence

needed to overcome summary judgment.

The Court rarely comments in this manner at the beginning of

opinions.    But, in this particular case, the parties' actions have so

significantly affected the outcome of the Plaintiffs' claims, that these

matters needed to be explained initially, before the Court addressed the

Motion for Summary Judgment.  The rules of pleading and evidence exist

for a reason; they define the matters at issue in the lawsuit and keep the

trial free of irrelevant and improper matters.  As counsel well know, both

they and the Court are required to follow these rules.

<u>STATEMENT OF FACTS</u>

Because each Plaintiff's claim is separate, the Court will address the

evidence that has been submitted relevant to each party's claim separately, and then analyze each claim separately, as set forth below.

RICKEY DAVIS

Davis is an African American man.  Davis joined the Department on May 1, 1981.  On May 1, 1988, he was assigned to Detective in the Criminal Investigations Division (Criminal Investigations).[3]  In the summer of 1993, he and Plaintiff Officer Ralph Harris (Officer Harris) were assigned to investigate the death of an African American citizen named Floyd Stringer.  Response, Exhibit 20, Deposition of Rickey Davis (Davis Deposition), at 7.  Stringer died in police custody.  Davis and Officer Harris ultimately determined that Stringer's death was the fault of three Caucasian officers: Greg Williamson, Dan Zabados, and Tim Garrett.  According to Davis, Stringer had mental problems and was under the influence of crack cocaine when the officers arrested him.   Davis and Officer Harris determined that these officers had not been properly trained to handle this situation, and as a result, they took steps which caused Stringer's death.  Id., at 127-28.

---

[3]Davis sometimes refers to the Criminal Investigations Division as the Detective Bureau.  The Division may have undergone a name change at some point.  The Court will use the name Criminal Investigations throughout the Opinion.

Davis and Officer Harris encountered a great deal of difficulty and hostility from other officers throughout the Stringer investigation.  There were delays in receiving reports and other information.  Police union officials spoke out publically against the investigation.  Other Detectives also made harsh comments criticizing Davis and Officer Harris for investigating other officers.  Some officers would not speak to them after the investigation started.  They were also ostracized by other officers.  Id., at 35-36, 41-44.

In one instance, Davis and Officer Harris needed to see Stringer's clothing.  The clothing was being held in the evidence room.  The evidence clerk made a derogatory remark about Stringer and the investigation.  He gave Davis and Officer Harris the clothes.  Davis and Officer Harris were overwhelmed by the pepper spray that was left on the clothing.  When they left the evidence room, one of the officers under investigation, Dan Zabados, was standing outside the evidence room.  Zabados made a comment to the effect that he was not pleased with what Davis and Officer Harris were doing.  Id., at 36-40.

Davis and Officer Harris reported the animosity of the other officers to then Police Chief Harvey Davis.  Chief Davis is an African American man

and the brother of Plaintiff Davis.  Chief Davis did not do anything to address these problems.  Id., at 44-45.  In early 1994, Davis also wrote a letter to Chief Davis and the Mayor of Springfield.  The letter explained the problems they anticipated as a result of their investigation of Stringer's death.  Id., at 50.

In 1994, Davis, Plaintiff Lea Joy, and two other African American officers, Kirk Robinson and Robert Williams, applied for promotion to the rank of Sergeant.  The promotions process involved taking an examination.  Chief Davis intended to promote the top twenty candidates.  The police union and several aldermen proposed only promoting the top eight candidates.  Davis, Joy, Robinson, and Williams were among the top twenty candidates, but none of them were in the top eight.  Id., at 46.

At that time, African American officers belonged to a group known as the Springfield Ethical Police Society (Ethical Society), later know as the Black Guardians Association of Central Illinois (Black Guardians).  The Ethical Society held town meetings to gather community support for promoting all twenty officers.  As a result of their efforts, a large group of black citizens attended a City Council meeting to support the promotion of all twenty officers.  All twenty were promoted.  On May 24, 1994, Davis,

Joy, Robinson, and Williams, along with sixteen Caucasian officers, were all promoted to the rank of Sergeant.  Id., at 46.[4]

After his promotion, Davis was assigned to the Major Case Unit within Criminal Investigations.  In 1995, his assignment changed to the desk in Criminal Investigations.  Davis states that this transfer was a demotion.  He states that the desk assignment was less prestigious than the Major Case Unit.  Id., at 50.  The desk assignment also had reduced responsibilities.  While in the Major Case Unit, Davis supervised the investigation of major violent felony crimes.  In the desk assignment, he answered the phone and reviewed closed cases.  Response, Exhibit 36, Affidavit of Rickey Davis (Davis Affidavit), ¶ 115.

In the fall of 1995, Defendant John Harris (Chief Harris) became Chief of the Department.  In the summer of 1996, Davis' assignment was changed to the Patrol Division (Patrol), second watch.  Davis stated that reassignment to Patrol was a further reduction in prestige and responsibilities, and a reduction in compensation.  Sergeants in Criminal

---

[4]Davis says that unidentified individuals referred to them as "Velcro" Sergeants, meaning that their Sergeant stripes should be put on with velcro because the promotion would only be temporary, and the stripes would be taken off soon.  Davis Deposition, at 188.  Davis does not identify the individuals who made these comments or the context of the comments.

Investigations were not required to work weekends or holidays. <u>Davis Affidavit</u>, ¶ 112. Sergeants in Criminal Investigations also received additional compensation in the form of a clothing allowance. <u>Reply</u>, Exhibit 21, <u>Affidavit of Donald Kliment</u>, ¶ 4; <u>see</u> <u>Davis Deposition</u>, at 54-56.

Chief Harris states that he had a practice of regularly rotating his supervisory personnel to different divisions in order to cross train supervisors in various divisions of the Department. <u>Motion for Summary Judgment</u>, Exhibit 9, <u>Affidavit of John Harris (John Harris Affidavit)</u>, ¶ 4. Davis notes, however, that Sergeant Donald Kliment remained in the Field Operations Division throughout Chief Harris' tenure with the Department. <u>Davis Affidavit</u>, ¶ 37.[5]

Between 1997 and 2001, Davis repeatedly applied to be reassigned to Criminal Investigations, but in each instance, Caucasian Sergeants were given the assignment. Davis states that he had more experience as a

---

[5]Davis states that Kliment told him he refused a transfer to the Criminal Investigations Division. <u>Davis Affidavit</u>, ¶ 36. This statement is hearsay. Davis argues that the statement is an admission of a party opponent. The Court disagrees. Davis states that Kliment made this statement to him in January or February 2003. <u>Response to Motion to Strike Affidavits of Harris and Davis (d/e 288)</u>, Exhibit K, <u>Affidavit of Rickey Davis</u>, ¶ 7. Davis makes no showing that Kliment was authorized by the City to make this statement within the scope of his agency. Thus, the statement cannot be attributed to the Defendants. <u>See</u> <u>Fed. R. Evid.</u> 801(d)(2)(D). Davis, however, can testify to his own observations of Kliment's assignments.

Detective than these officers, but he presents no evidence to show the basis of his personal knowledge of the other officers' experience or to corroborate his assertions. <u>Davis Deposition</u>, at 61-62; <u>Davis Affidavit</u>, ¶¶ 77-78, 124.

Also, according to Davis, from 1997 to 2001, numerous complaints were filed against him with the Internal Affairs Division (IA). <u>Davis Deposition</u>, at 63. One of the complaints was that Davis improperly approved an African American civilian employee (Carol Gaston) of the Department's report. Davis signed off on a report prepared by Gaston that was incomplete. Gaston did not have all of the necessary information to complete the report by the time that Davis' shift ended. Davis asked the Sergeant who relieved him to make sure the report was complete. <u>Id.</u>, at 9. That was not done, and Davis was disciplined for approving the incomplete report. Davis states that the discipline was improper.

During the time that Davis and Gaston worked together, Davis also filed an IA complaint regarding the treatment of Gaston. Other officers were making improper sexual remarks that alluded to Gaston's gender, color, and weight. <u>Id.</u>, at 128-29.

In 1999, Davis and Plaintiff Joy applied for promotion to Lieutenant. A year earlier, in 1998, two Caucasian officers, William Pittman and Kevin

Keen, had asked Chief Harris for suggestions on what they could do to prepare for their future careers. Chief Harris suggested a book on community policing. John Harris Affidavit, ¶ 7. This book was later made part of the study materials for the examination that were issued by the City's Civil Service Commission sixty days before the examination. Shortly before taking the examination, Davis and Joy learned that Keen and Pittman had been given the book by Chief Harris. Joy and Davis complained that Chief Harris had given these officers an unfair advantage in violation of Civil Service rules. The City's Civil Service Commission delayed the examination from fall 1998 to January 1999, to give all applicants additional time to study for the examination. Id., ¶ 8; see Response to Motion to Strike Affidavits of Harris and Davis (d/e 288) (Response to Motion to Strike), Exhibit C, Illinois Department of Human Rights (IDHR) Investigation Report. Davis and Joy also filed a complaint with the IDHR. The IDHR found a lack of substantial evidence to show any racial discrimination. IDHR Investigation Report, at 5. Davis and Joy took the examination in January 1999, along with sixteen other officers, fourteen of whom were Caucasian including Pittman. Pittman was ranked first among the applicants, Joy was ranked thirteenth, and Davis was ranked

sixteenth.   <u>Response to Motion to Strike</u>, Exhibit D, <u>Civil Service Commission Promotional Eligibility List Police Lieutenant January 1999</u>. Joy was promoted to Lieutenant on October 14, 1999. Davis was promoted to Lieutenant on June 4, 2001.

In early 2000, Davis and others filed an IA complaint against Assistant Chief James Burton for failing to perform his duties as an officer. According to Davis and Harris, Burton came to a bar in Springfield named Mac's Lounge. Several African American police officers worked second jobs at Mac's Lounge while off-duty. Davis claims that Burton made an accusation that these off-duty officers observed illegal drug use at the bar and took no action. Davis and Officer Harris filed an IA complaint against Burton on the grounds that he must have also seen this activity and took no action. <u>Davis Deposition</u>, at 15.[6]  Officer Harris states that Chief Harris ordered them to file the IA complaint against Burton.   <u>Response</u>, Exhibit 21, <u>Deposition of Ralph Harris (Ralph Harris Deposition)</u>, at 54-55. Officer Harris states that the complaint against Burton was determined to be

---

[6]Davis also testified about statements by the bar owner concerning the bar owner's conversations with Burton. <u>Davis Deposition</u>, at 14-15. This is clearly hearsay and will not be considered.

unfounded.  Id., at 18.[7]

Also in 2000, Davis attended the Northwestern University Staff and Command School.  While attending this course, Davis wrote a paper about race relations in the Department in which he commented on the Department's lack of effort in recruiting.  He provided a copy of the paper to Chief Harris.  Davis Deposition, at 11-12.

On January 3, 2001, Davis wrote a letter, as President of the Black Guardians, to Carl Madison, then President of the local chapter of the NAACP.  The letter complained about the failure of Caucasian officers to respond to requests for assistance by off-duty African American officers who were working second jobs at Mac's Lounge.  Davis sent copies of the letter to all Department staff.  Id., at 13.  Davis and Officer Harris state that African American officers had a great deal of trouble getting assistance at Mac's Lounge.  They claim that Caucasian officers work off-duty at other bars and do not have trouble receiving assistance.  Davis Affidavit, ¶ 89.

On February 2, 2001, Lieutenant Greg Smith gave Davis a written

---

[7]The Plaintiffs state that in their response they were subjected to an IA complaint for filing the complaint against Burton.  Response, at 28, ¶ 187.  The Plaintiffs cite Officer Harris' deposition to support this assertion.  Harris states that he heard of incidents elsewhere in which African American officers were ordered to file complaints and later disciplined for doing so.  He does not state that he was disciplined for filing the complaint against Burton.  Ralph Harris Deposition, at 55-56.

reprimand for taking too much time for lunch.  Smith stated that Davis took ten minutes too long for lunch.  Davis denies that he took too long for lunch.  Id., ¶¶ 79-84.  Davis also states that he observed Lieutenant Smith regularly leaving his second watch shift at 10:30 p.m. when the third watch Lieutenant came on duty, even though Smith's second watch shift did not end until 12:00 a.m.  Id., ¶¶ 85-87.  Davis said that the practice of leaving when the next watch Lieutenant came on duty was common among all Lieutenants.  Id., ¶ 87.

On June 4, 2001, Davis was promoted to Lieutenant.  Upon his promotion, Chief Harris instructed Davis to stop working off-duty at Mac's Lounge.  Davis states that he suffered a significant loss of income because he had to quit his second job.  Davis Affidavit, ¶¶ 88-92.[8]

Davis was also assigned to the third watch upon his promotion to Lieutenant.  He preferred the second watch, but his request for the second watch was denied.  Assistant Chief Burton told Davis that watch assignments were based on seniority and he was the junior Lieutenant.

---

[8]Davis states in his Affidavit that Lieutenant William Rouse worked off-duty at the Red Roof Inn, and Lieutenant Charlie Cox worked off-duty at Steak n' Shake, but he gives no foundation to establish that he has personal knowledge of these facts.  Davis Affidavit, ¶ 94.  Davis deposed Rouse, but Davis did not submit any testimony that corroborates his assertions about outside work.  Response, Exhibit 31, Deposition of William Rouse.

Second Davis Affidavit, ¶ 20.

In 2001, Chief Harris asked his Lieutenants to tell him their assignment preferences. Davis again asked for Criminal Investigations. Chief Harris assigned Lieutenant Dave Dobson, a Caucasian man, to Criminal Investigations rather than Davis. Davis states that Dobson had spent all of his career in Patrol, and Dobson had no investigative experience. Davis Affidavit, ¶¶ 120-21. Davis does not state the basis for his knowledge of Dobson's investigative experience.[9]

In February or March 2002, Davis and the other Plaintiffs held a press conference as members of the Black Guardians in front of the Martin Luther King statue near the Illinois State Capitol building in Springfield. Davis states that he and the other officers made a public statement about racial problems in the Department, and specifically came out in support of Renatta Frazier.[10] Frazier is an African American woman, and was at that time, an officer in the Department. At the time of the press conference, Frazier was the subject of several IA investigations. The most serious

---

[9]Davis deposed Dobson, but did not submit any testimony regarding his investigative experience. Response, Exhibit 40, Deposition of David Dobson.

[10]Frazier was a Plaintiff in this case, but the parties have already settled her claims.

charges arose from an incident in October 2001.  Newspapers had reported that Frazier was accused of responding improperly to a call, and as a result, a rape occurred.  Several months later, the Department revealed that the rape occurred before Frazier was sent on the call, and so, she could not have prevented the rape.

On March 27, 2002, Davis and Officer Harris attended a Day Away meeting with Chief Harris and others from the Department.  Davis states that he and Officer Harris, and the others, discussed racial problems, recruiting issues, and discriminatory practices in the Department.  Davis Deposition, at 20; Summary Judgment Motion, Exhibit 16, Day Away agenda, materials, and notes.

On or about April 29, 2002, Frazier was evicted from her home.  Davis states that numerous Department officers were present observing the eviction and laughing and joking.  Davis attempted to pay the rent for Frazier in order to avoid the eviction.  According to Davis, the payment was refused after the landlord spoke with Department Lieutenant William Rouse.  The next day, Davis attended a meeting with Chief Harris and Reverend Jesse Jackson.  At the meeting, Chief Harris yelled at Davis for being present at the Frazier eviction the previous day.  Davis Deposition, at

164-68.

On June 3, 2002, Davis and Officer Harris traveled to Washington, D.C., to meet with representatives of the U.S. Department of Justice to discuss racial problems within the Department.  Davis and Officer Harris stated in the meeting that African American officers were written up on bogus claims so that they could be terminated by Chief Harris.  <u>Ralph Harris Deposition</u>, at 13.  Davis and Officer Harris also stated at the meeting that the Department was misusing the "weed and seed" grant money.  The grant was designed to fight drugs, but Davis and Officer Harris stated that the funds were used to issue tickets to African American citizens and to pay overtime for officers.  <u>Id.</u>, at 11-12; <u>Davis Deposition</u>, at 24-26.

After they returned from Washington D.C., Davis states that Assistant Chief William Pittman was furious that Davis and Officer Harris had gone to this meeting.  Davis states that Pittman was yelling and cursing at him, and pointing his finger at Davis in a threatening manner.  Davis filed an IA complaint about Pittman's behavior.  <u>Davis Deposition</u>, at 24-26.

In July 2002, Davis and Officer Harris asked for permission to attend the National Black Policemen Association's (NBPA) national convention, scheduled for August 2, 2002.  The Department authorized them to attend

22

and said that their time would be considered school time.  The Department, however, would not pay any expenses.  <u>Reply</u>, Exhibit 7, <u>Memoranda from Chief Harris to Davis and Officer Harris</u>, dated July 24, 2002, and July 31, 2002.  Kliment states the City also allowed Caucasian officers to attend conventions as school days.  <u>Response</u>, Exhibit 17, <u>Deposition of Donald Kliment (Kliment Deposition)</u>, at 103-04, 113.  <u>Kliment Deposition</u>, at 103-04, 113.

In July 2002, Davis filed an IA complaint against a Caucasian officer, Angela Westlake, who had called an African American citizen a "nigger."  Assistant Chief Pittman ordered that the complaint should not be investigated.  He stated that these matters should be handled by Westlake's supervisors rather than through Internal Affairs.  <u>Id.</u>, at 175; <u>Reply</u>, Exhibit 23, <u>Memorandum from Pittman to Lieutenant Robert Williams dated July 23, 2002</u>.

In August 2002, Chief Harris disciplined Davis at a senior staff meeting for having Sergeants write monthly beat reports.  Chief Harris presented Davis with a written reprimand in front of the other Lieutenants and yelled at Davis in front of the other officers.  Davis found this to be very humiliating.  Davis states he was following the procedures for preparing

reports that had been given to him by his supervisor, Assistant Chief Dan Hughes.  <u>Response to Motion to Strike</u>, Exhibit K, <u>Affidavit of Rickey Davis (Second Davis Affidavit)</u>, ¶¶ 12-13.

In September 2002, Davis again asked for an assignment to Criminal Investigations.  He again was not selected for the position.  Lieutenant Robert Williams, an African American, was one of the officers selected for this assignment.  On September 6, 2002, Williams wrote a memorandum to Ralph Caldwell, the Assistant Chief of Criminal Investigations accepting the position.  <u>Response to Motion to Strike</u>, Exhibit F, <u>Memorandum from Williams to Caldwell dated September 6, 2002</u>.  In the memorandum, Williams stated that Davis was the most qualified of all the Lieutenants for the assignment, including himself.  <u>Id.</u>

In the fall of 2002, Lieutenants Charlie Cox and Greg Williamson were assigned to the second watch.  Davis then asked for a second watch assignment, but the request was denied.  Davis had seniority over Cox and Williamson.  <u>Second Davis Affidavit</u>, ¶ 20.

In October 2002, Lieutenants Al Pinter and Randy Wilson sent memoranda to Assistant Chief Pittman indicating that Davis was missing during his shift and was rumored to be visiting a girlfriend during his shift.

Response, Exhibit 41, Deposition of Patrick Fogleman (Fogleman Deposition), at 104; Summary Judgment Motion, Exhibit 20, Memoranda from Pinter and Wilson to Pittman, dated October 14, 2002. Patrick Fogleman from IA was ordered to investigate Davis' whereabouts while on duty. Fogleman examined Davis' emails and records of his other communications. Fogleman found a lack of activity. Fogleman Deposition, at 106-09. Chief Harris ordered Fogleman to put Davis under surveillance. Fogleman and Assistant Chief Mary Vasconcelles placed a tracking device on Davis' vehicle and followed him in a rented vehicle. Davis figured out that they were following him and stopped their vehicle. They denied that they were following him. Fogleman states that they did not find Davis doing anything improper. Davis was not followed again. Fogleman Deposition, at 113-15, 139; Davis Deposition, at 134-35, 139. Thereafter, Davis filed an IA complaint against Chief Harris because of the surveillance. Davis Deposition, at 30-31.

In December 2002, Davis was assigned to Criminal Investigations. John Harris Affidavit, ¶ 3. The Complaint in this case was then filed on January 9, 2003.

Davis references several other events without giving any dates. Thus,

it is difficult for the Court to put these events in context. Davis and Officer Harris completed PPCT training, but they were never assigned to teach. According to Officer Harris, PPCT refers to training on the use of pressure points to subdue individuals. <u>Ralph Harris Deposition</u>, at 147.[11] Davis and Officer Harris never applied to teach. <u>Id.</u>, at 147-49. The City hired the law firm of Husch and Eppenberger to investigate the Department in light of the Frazier investigation. Davis told members of the law firm about racial problems in the Department. <u>Id.</u> Current Chief Kliment states that at some point in time Davis and Officer Harris requested permission to attend an NBPA convention. The request was denied, but the date is not given. <u>Kliment Deposition</u>, at 103-04.

Davis states that throughout his career, Caucasian officers routinely told "nigger" jokes in his presence. He states that these jokes were regularly told in meetings in front of supervisors with no repercussions to the person telling the jokes. He states that racially offensive graffiti was written all over the bathrooms. He states that the Department eventually put chalk boards up in the bathrooms on which officers could write this graffiti. He said that he never observed anyone disciplined for this behavior. <u>Davis Deposition</u>,

---

[11]No party submitted evidence indicating what PPCT stands for.

Exhibit 20, 56-57.

Davis states that he once received a written reprimand for not booking evidence correctly.  He stated that this reprimand was unfair because he followed appropriate procedures.  Id., at 63-65.

Davis also states that the Black Guardians also filed an IA complaint against the individuals responsible for handling the Frazier investigation. He states that only one Sergeant was disciplined as a result and that no one higher in the chain of command was disciplined.  Id., at 130-31.

RALPH HARRIS

Officer Harris joined the Department on November 27, 1978.  Early in his career, Officer Harris heard Officer Tapscott call a suspect a "nigger." Ralph Harris Deposition, at 162, 248.  Officer Harris states that officers charged with making racial slurs were never disciplined.  Id., at 131.  Officer Harris presented no other evidence of examples or details of any use of racial slurs.

As discussed in detail above, in 1993, Chief Harvey Davis assigned Officers Harris and Davis to investigate Floyd Stringer's death, and they determined that four Caucasian officers were responsible for the death. Officer Harris stated that he was well-liked before this investigation, but

after that, everything changed.   Officer Harris states that other officers ignored him and avoided him.

Officer Harris said in his deposition that officers starting "keying up" his microphone after the Stringer investigation was completed.  "Keying up" involved blocking an officer's radio signal so that he could not use his radio. Ralph Harris Deposition, at 43.  Officer Harris, however, stated elsewhere in his deposition that the "keying up" practice stopped by the time that Harvey Davis became Chief.  He stated that the Department installed new equipment that identified anyone who tried to key up another officer's radio.  Id., at 218-19.  He stated that he was never "keyed up" while Harvey Davis was Chief, "When Harvey Davis was chief of police, I never had, not one incident."  Id., at 218.  Since Officer Harris conducted the Stringer investigation during Harvey Davis' tenure as Chief, it is unclear how officers could have keyed him up in retaliation if he was never keyed up at that time.

Defendant John Harris became Chief of the Department in 1995. Shortly thereafter, Officer Harris was moved from Planning and Research to the "streets."  Officer Harris does not define the term "streets", but the Court assumes he means Patrol.  Officer Harris considered this a demotion.

28

Id., at 223.  Officer Harris stated that he was given a "raggedy" squad car at this time.  Citizens commented on the condition of the car.  Id., at 223-24.  Later, Officer Harris received a new car.  Shortly thereafter, a notch was cut out of the steering wheel of the car.  Id.  Officer Harris also stated in his deposition that at other times throughout his career, cars assigned to him were spat upon and dented.  He also states that Caucasian officers with less seniority were assigned newer vehicles than his, even though the assignments were supposed to be based on seniority.  Id., at 25, 46-47, 174, 176, 220-23.   The time frame for these events is unclear from the deposition.

In 2000, Officer Harris was on the eligibility list for promotion to Sergeant.  He was fourteenth on the list.  Individuals were promoted in rank order from the list as openings occurred.  Lists expired after a certain period of time.  This particular eligibility list was to expire before enough openings had occurred to allow Officer Harris to be promoted.  Chief Harris had the authority to extend the time that the list would remain effective, which would have allowed Officer Harris to be promoted.  Chief Harris refused to extend the list, and so, allowed it to expire.  Id., at 252.

On September 19, 2001, Officer Harris asked for leave to attend a

convention in Michigan on October 19-20, 2001.  He was scheduled to speak at the convention.  His request for leave was denied on September 20, 2001.  On October 4, 2001, Officer Harris made reservations to fly to Michigan to attend the convention.  Officer Harris then called in sick for October 19-20.  He states that he was sick with sinusitis.  He called his doctor and got a prescription for sinus medicine.  He then went on his trip to Michigan.  He was disciplined for abusing sick leave.  He disputes whether this discipline was justified.  Id., at 125-28, 130, 135, 269-72; Summary Judgment Motion, Collective Exhibit 15 (d/e 276), Grievances, Disciplinary Proceedings and Internal Investigation Summaries, docket entry 276-3 at 53 of 61.[12]  Harris states that Caucasian officers abused sick leave and were not punished.  He states that he complained to Lieutenant White about this abuse, but White told Harris that he could not do anything about it.  Ralph Harris Deposition, at 129-30.

In December 2001, Officer Harris was charged with an IA complaint based on the complaint of a citizen named Helen Corn.  On November 15, 2001, Corn called the Department to report a stolen wallet.  Officer Harris

---

[12]Exhibit 15 is an extremely long collective exhibit of IA complaints and investigation summaries.  The Court references them by the document number and page number assigned by the Court's CMECF filing system.

took the call initially, but told her to call back because he was too busy to make a report at that time.  She called back, but Officer Harris was at lunch.  Officer Pat Selvaggio, a Caucasian man, took the call again but did not make a report.  She called back again, but Officer Harris again did not make out a report.  Corn called back on November 27, 2001, to get the file number of the report of her complaint and discovered that no report had been made.  She then complained about Officer Harris.  She states that someone used her stolen credit card to buy over $1,000.00 in merchandise.  During the investigation, Corn stated that Officer Harris told her to climb into a dumpster to look for the wallet.  Officer Harris denies that he stated this.  Officer Harris received a written reprimand as a result of this incident.  Officer Harris complains that Officer Selvaggio was not subjected to an IA complaint. Id., at 118-122, Summary Judgment Motion, Collective Exhibit 15 (d/e 276), Grievances, Disciplinary Proceedings and Internal Investigation Summaries, docket entries 276-2 at 53; 276-3, at 2-36; and 276-4, at 1-37.

In June 2002, Officer Harris was again investigated for improper use of sick leave.  He took sick leave on June 2, 2002.  He had been assigned to the first watch that day, which ended at 3:30 p.m.  At approximately 12:00

a.m. midnight June 3, 2002, he traveled to Washington, D.C. with Davis to speak with the U.S. Department of Justice about the weed and seed program. Officer Harris states that he was sick on June 2, 2002, and his use of sick leave was proper. Ralph Harris Deposition, at 123. The complaint of improper use of sick leave was not sustained, and Officer Harris received no discipline as a result of this investigation. Exhibit 15, docket entry 276-1, at 2, Official History Summary, results of Investigation 2001/12/130.

Officer Harris testified in his deposition about several other events, but he provided no time frame for these occurrences. Officer Harris stated that he requested to work in dispatch because he had a background in radio. His request was never granted. Id., at 145-46. Officer Harris also requested an assignment to the gang unit. He had training in this area. He was assigned to the gang unit for a time, but he was then reassigned. Id., at 148-52. He stated that Caucasian officers assigned to the gang unit did not have the same training that he had received. He stated that during an Ethical Society meeting, Caucasian officers took down license plate numbers of the vehicles driven by those attending. Id., at 49-50. Officer Harris states that when he was in Criminal Investigations, he was given the worst car. He states that newer cars went to Caucasian officers with less seniority. Id., at

32

174-75.

Officer Harris stated that once, while at the firing range for target practice, someone had plugged up the end of his carbine so that it would explode when he tried to fire it.  Officer Harris tried to fire the carbine, but the weapon would not fire.  He then inspected the weapon and found the obstruction.  He states that the only reason the weapon did not explode was because the round would not seat properly.  After that incident, Officer Harris feared for his life.  Id., at 154-58.

Officer Harris states that he was charged with domestic battery and acquitted.  He states that Officer Scott Allen lied at the trial.  Id., at 103-07.[13]  Even though Harris was acquitted, there was an IA investigation in which the charges were sustained.  As a result, Officer Harris was sent back to the streets as a patrol officer.  Id., at 95-96.  Officer Harris claims that he later worked in the records division and discovered that four or five Caucasian officers had been charged with domestic battery, but they were not subjected to an IA investigation.  Id., at 102.  Officer Harris does not submit to the Court the records he so discovered, or any other information

---

[13]Officer Harris states that Davis told him that Allen said that Allen was going to "fuck" Officer Harris at the hearing.  Ralph Harris Deposition, at 103-07.  Harris' testimony of what Davis said Allen said is clearly hearsay and will not be considered.

about these other officers.

Officer Harris participated in the press conference held by the Black Guardians to support Frazier in 2002.  Thereafter Officer Harris received a death threat.  He reported it to Chief Harris, but Officer Harris states that nothing was done.  <u>Id.</u>, at 242.  Officer Harris also states that he received more IA complaints against him after supporting Frazier than he had received in the previous twenty years.  <u>Id.</u>, at 131, 135.  Officer Harris also asserted in his deposition that Caucasian officers who do not support the racist and discriminatory behavior of the other officers are often excluded from assignments.  <u>Id.</u>, at 216.

<u>LEA JOY</u>

Joy joined the Department on September 26, 1983.  She experienced several problems very early in her career.  During her probation period, she was assigned to the transport truck, referred to as the "ice cream truck".  <u>Response</u>, Exhibit 22, <u>Deposition of Lea Joy (Joy Deposition)</u>, at 95.  She states that this truck stayed downtown.  As a result she was not allowed to go out on patrol and so did not learn, during the probationary period, how to conduct patrol and respond to calls.  <u>Id.</u>  As a new recruit, Joy states that she was not allowed to ask questions.  She states, "If I asked questions, I

was written up for it."  Id., at 93.  Right after she graduated from the academy, she asked her supervisor (whom she identified as Sergeant Smith) a question, and he responded, "If you have to ask that questions, maybe you need to look for another job."  Id.  Early in her career, officers called her "Ms. Joy" instead of "Officer Joy".  She considered this to be disrespectful. Id., at 93.  One officer named Frank Natale always called her Ms. Joy throughout her career.  Id., at 128.

In 1984 or 1986, then Police Chief Walton told Joy that some officer referred to her as an "African cunt."  Joy does not know who made the statement, and does not know whether it was repeated, or how often.  Id., at 147.  Also, early in her career, Officer Sandy Vacker said something about Joy having chicken grease on her steering wheel.  Joy considered this a racial slur.  Id., at 140-41.  Joy states that jokes about chicken grease followed her for twenty years.  Id., at 140-41; see Response, Exhibit 25, Deposition of Melody Holman, at 11-13.

In 1994, Joy applied for the canine unit.[14]  Officers in the canine unit received some additional overtime to take care of the dog at home.  Joy

---

[14]It is unclear from the documents whether she applied in the 1980's, but, if so, no evidence has been submitted about that application.  See Davis Deposition, at 83.

states that she was the top applicant, but she was put on the bottom of the eligibility list.  According to the City, Joy was put at the top of the list, but she was promoted to Sergeant on May 24, 1994, before anyone from the list was assigned to the unit.  Sergeants are not assigned to the canine unit.  Joy claims that some less qualified individuals were assigned to the canine unit before she was promoted to Sergeant.  Joy Deposition, at 59; Response, Exhibit 39, Affidavit of Lea Joy; Summary Judgment Motion, Exhibit 13, Affidavit of John Hauversburk; Reply Exhibit 30, Excerpts from collective bargaining agreement.  See Davis Deposition, at 124-26.  She does not identify any of these individuals or provide any other evidence about them or their assignment to the canine unit.

Defendant Officer Harris became Chief in the fall of 1995.  Soon after this, Joy was moved from crime prevention to the midnight shift, presumably the third watch.  Ralph Harris Deposition, at 223.

In December 1997, Joy applied for training to be a Fire Arms Training instructor called a "FATS" instructor.  She was not selected.  She said that she was the only applicant who was denied this training.  Joy Deposition, at 40.  The documents state that Sergeant Mark Bridges disapproved the application because Joy had previously refused to teach mobile data terminal

(MDT) after attending the MDT instructor training course.  Summary Judgment Motion, Exhibit 14, Seminar Application.  Joy states that she bowed out of teaching MDT after taking the class because she did not have a terminal in her vehicle and so did not have experience with the equipment. Joy Deposition, at 40.

As discussed above, Joy took the Lieutenant examination with Davis in 1999, and she discovered that Chief Harris had recommended a book to Pittman and Keen that was later designated as one of the study materials for the examination.  She joined Davis in filing a complaint with the IDHR. She took the test and was promoted to Lieutenant in October 1999.

In 2001, Joy was assigned to IA.  She was assigned to investigate an IA complaint against Frazier.  Joy does not identify the substance of the complaint.  When she read the complaint, she said that she would charge everyone in the chain of command because the complaint was three to four months late.  She said, "They had knowledge of it, why are they just waiting for a he said/she said thing now?"  Id., at 64.  When she said this, the investigation was taken away from her.  Id.

Later, Joy was assigned to investigate an IA complaint against Frazier based on an event that occurred at a Road Ranger filling station.  This

complaint charged Frazier with lying when she was asked about the incident. Joy said that the complaint was not valid, and the person who filed it should be investigated for filing a "ridiculous, unprofessional complaint." Id., at 64. She stated that she would be glad to investigate it, but the complaint made no sense. Id., at 65. Joy also noted that, at some other point in time during her tenure in IA, she was ordered not to charge a Caucasian officer with lying. Id., at 68-69.

Joy states that she complained to Assistant Chief Vasconcelles that the Department was discriminating against Frazier in connection with the investigations. Id., at 71-72, 206-07. According to Joy:

> So I was talking to Vasconcelles, and I said, "I really don't feel comfortable with this. I believe that it's unfair to Renatta [Frazier], that they're discriminating, and I really don't want to have anything to do with this investigation." And she said, "Have you spoken to the Chief about that?" And I said, "No, I haven't." And she said, "Well, don't you think it would be a good idea to speak to the Chief?" And I said, "You know, you're right, that would be." So she called me either at home or at five o'clock that same day and said, "You will be in the Chief's office tomorrow at 8:00 o'clock."

Id., at 72. The next morning she met with Chief Harris and Vasconcelles. According to Joy:

> The Chief is over there, he says,

38

"Lea, you're incompetent.  I'm taking you out of IA.  You're not doing your job.  I'm going to write you up for insubordination for not doing the Renatta [Frazier] case, and you're to be out of the office," I think by today at 5:00 o'clock, "and you're no longer welcome back there.  You're going to be transferred into field support."

Id., at 73.  Chief Harris says that he transferred her because, "she refused to re-interview Renatta Frazier to determine whether Frazier had lied during her Internal Affairs interview."  John Harris Affidavit, ¶ 5.  Joy responds in her Affidavit, "I did not refuse to re-interview Renatta Frazier, but was unable to re-interview Frazier because she was on leave, a fact which I communicated to my superiors."  Response, Exhibit 39, Affidavit of Lea Joy, ¶ 7.  She further states, "At the time John Harris advised me that I was being transferred from Internal Affairs to Field Support, he did not mention anything about my re-interview of Frazier."  Id., ¶ 8.  Joy states that only a few weeks before transferring her, Chief Harris told her that she was doing a good job.  Joy Deposition, at 133-34.

Joy was then transferred to Field Support.  Normally, Field Support is considered a better assignment than Internal Affairs.  Joy states, however, that her supervisor, Assistant Chief Mike Geiger, significantly curtailed her responsibilities after she arrived there.  Officers were allowed to go around

her to Geiger.  Id., at 180-83, 196.  She was required to secure Geiger's approval for all decisions.  No other Lieutenant was required to secure Geiger's approval for decisions.  Id., at 207.

Joy also mentions other problems she faced without giving specific time frames.  Joy states that she never had a partner.  No Caucasian officer would ride with her.  She felt ostracized by the other officers.  Id., at 14. Officers who would talk to her would also be ostracized.  Id.  Joy felt invisible at meetings; she would need to get loud to have anyone pay attention to her.  Id., at 9-10.  Many Caucasian officers considered her to be incompetent and made disparaging comments about her in the presence of Plaintiffs Holman and Moore.  Response, Exhibit 24, Deposition of Cleo Moore (Moore Deposition), at 11-15; Response, Exhibit 25, Deposition of Melody Holman (Holman Deposition), at 14, 17.  She applied for assignments to the honor guard, to work as a Detective, and to work as a crisis negotiator, but she was denied each time.  Joy Deposition, at 22, 154-55, 162, 206.[15]  Joy was once given a car in very bad condition.  Id., at 41,

---

[15]Joy states that Sergeant Wilson told her that Assistant Chief Pittman made a statement that as long as he was there, she was not going to get anything.  Joy Deposition, at 36-37.  This is hearsay and will not be considered.

159, 201.[16]

When she was a Sergeant, she was not issued an AR15 rifle and not given an opportunity to practice with the rifles.  Id., at 160-61, 205.  She also was not told that she did not need to write out explanations for use of overtime, but Caucasian officers were informed of this change in procedure.  Id., at 135.  Joy states that she was unfairly charged with improper use of sick time when she was actually sick.  Id., at 87-89.[17]  Joy states that once she was ordered to provide information to Bridges.  She turned in the information late and was disciplined.  She states that Caucasian officers did not turn in the information at all and were not disciplined.  Id., at 135.

Joy was assigned as a mentor for Frazier when Frazier was in the academy.  Joy complained at that time that an Illinois State Police officer named Tracy discriminated against Frazier.  Joy wrote up a complaint about Tracy and gave it to Chief Harris.  Chief Harris said that he would take care of it.  Joy states that Chief Harris did not do anything with the complaint,

---

[16]She states that a mechanic in the garage told her that he was instructed to give her the worst car, but he gave her the second worst car.  Joy Deposition, at 159.  What the mechanic told her is hearsay and will not be considered.

[17]She states that the person who filed the complaint was instructed by a superior to do so.  She also states that another officer told her that she was instructed to write Joy up once.  Id., at 88, 130-31.  These statements to Joy by other officers are inadmissible hearsay.

although she states that the Illinois State Police investigated Tracy because of an incident involving another recruit.  Id., at 103-08.

Joy states that while she was in IA, another Lieutenant, Karl ("Kent") Brunsman, was also working there.  The two of them held the same rank and did the same job, but he was paid more than she.  Brunsman had been a commander.  The Department returned him to the rank of Lieutenant without a reduction in pay, and assigned him to IA.  Under the City Code, his pay at the time of his return to the rank of Lieutenant could not be reduced unless he made more as a Commander than the top level of the pay scale for Lieutenants.  Reply, Exhibit 20, City Code § 36.46, Personnel transaction form for Karl Brunsman dated October 12, 1999; Joy Deposition, at 60.

DONALD EWING

Donald Ewing joined the Department on February 13, 1979.  In 1985 or 1986, Ewing applied for the assignment of Detective.  Caucasian officers with less experience than he were given the assignment.  He had trained several of them.  Response, Exhibit 23, Deposition of Donald Ewing (Ewing Deposition), at 19.  Ewing believes that these officers were less qualified than he for the assignment.  Ewing states that he applied a total of four

times during his career to be a Detective.  He was never selected for the assignment.

Sometime in the 1980's, Ewing heard a Caucasian officer named Don Kolar refer to an African American prisoner as a "nigger" and abused the prisoner until Ewing stopped him.  Id., at 27-28.

Defendant John Harris became Chief in 1995.  In 1995, Ewing applied to be the Neighborhood Police Officer (NPO).  He received the assignment. Id., at 18.  Caucasian officers who were selected for the NPO assignment received contact information to meet with members of the community. Ewing did not receive his contact information until two or three days later. Id., at 17.  As part of the NPO assignment, Ewing was allowed to live in a house in the neighborhood.  These houses were owned by the Department. About eight months after Ewing started his NPO assignment, Pittman told Ewing that "they all" thought Ewing would be the first to fail at the assignment.  Id., at 58-59.  Ewing took this to mean that Pittman was surprised that Ewing was doing a good job.  Id., at 59.

In April 2001, Ewing's NPO assignment ended, but the Department still let him live in the Department house.  Id., at 53-54; Reply, Exhibit 22, Ewing personnel action form.  Shortly after the NPO assignment ended,

Ewing attended a meeting with then Mayor Karen Hasara, her advisor Brian McFadden, Davis, Officer Harris, and Chief Harris.  At the meeting, Chief Harris became angry and threatened to take Ewing's NPO house away from him.  Id., at 47-53.  The Department did not take the house from Ewing.  Rather, four to five months after his NPO assignment ended, Ewing was allowed to purchase the house from the Department.  Id., at 54.

Ewing has also presented evidence of several matters without stating the time frame.  He states that he applied for Beat 300, but a Caucasian officer received the assignment.   Ewing was assigned to Beat 300 three months later.  This was the only time Ewing did not receive a requested beat assignment.  Id., at 42-43.  Ewing was given a car that was in worse condition than cars issued to Caucasian officers.  Id., at 64-65.  Ewing was issued used equipment, but Caucasian officers received new equipment.  Id., at 66-67.  Ewing was disciplined for having three automobile accidents in one year.  Id., at 6.  Ewing states that a Caucasian officer had three accidents, but he was not disciplined.  Id., at 14.  Last, Ewing states that he observed Caucasian officers rough up African American and Caucasian prisoners, but the African American prisoners were roughed up more than the Caucasian ones.  Id., at 30.

MELODY HOLMAN

Melody Holman joined the Department on April 9, 1987. She and Robert Williams were hired after a law suit was filed by the Springfield Ethical Police Society. Davis Deposition, at 143-44. Once, during Holman's probationary period, she was assigned to work with Officer Mark Bridges. A citizen came up to them and asked what to do to join the Department. Bridges told the citizen that you had to be female and black. Response, Exhibit 25, Deposition of Melody Holman (Holman Deposition), at 7-8.

In 2001, Holman wanted to work as a recruiter for the Department. Chief Harris told her that the Department was not big enough for a full time recruiter. Vasconcelles told Holman to apply for crime prevention, and she would do recruiting out of that office. Holman followed Vasconcelles' suggestion and transferred to crime prevention. Shortly after she transferred, the Department advertised for a full time recruiter. Holman did not apply because she had just transferred to crime prevention. A Caucasian officer, Heidi Hoheimer, received the recruiter assignment. Id., at 30, 77. After Hoheimer was selected, Holman received an employee evaluation in which she was given a low score in the category of interaction with co-

workers.  Id., at 30-31.  She asked Assistant Chief Geiger about the low score, and he responded, "Do you like Heidi?", referring to Hoheimer.  Id.

Holman identifies a number of other events, but does not give any time frame.  She states that she heard one officer use the word "nigger" to refer to a suspect the officer was chasing.  Id., at 24-25.  She states that Caucasian officers often would not talk to her and she would have to sit by herself.  Id., at 36, 63-66.  When she came up to a group of Caucasian officers, they often would, "hush up."  Id., at 90.  Once, Officer Mark Houston yelled at Holman in front of other Caucasian officers and told her to shut up.  Id., at 33.  After Houston said this, Holman just looked at him like he was crazy and went about her business.  Holman does not know why Houston did this.  Id.  Holman states that Houston did not treat Caucasian officers like that.  Id., at 83.

She also often heard Caucasian officers make disparaging comments about Plaintiff Joy.  She never heard officers speak about Caucasian Sergeants that way.  Id., at 14-17.  Caucasian officers made disparaging comments about Joy when Joy was promoted.  Id., at 14, 16, 19.  Holman heard an officer repeat the comment that Joy had chicken grease on her steering wheel.  Id., at 11-13.  Holman also observed Caucasian officers

46

ignore Frazier.  Caucasian officers would speak to Holman, but not Frazier.

Id., at 20-24.

CLEO MOORE

Moore joined the Department on August 28, 1995.  Defendant John

Harris became Chief in 1995, shortly after Moore joined the Department.

In 1996 or 1997, Moore applied to be assigned to the bicycle patrol in

downtown Springfield.  He states that he was the only person not accepted

for the assignment.  Response, Exhibit 24, Deposition of Cleo Moore

(Moore Deposition), at 25.  In 1998, Moore applied to be assigned to

Criminal Investigations as a Detective.  He was not selected.[18]

In 2001, Moore was disciplined for using mace in a hospital

emergency room.  He received a three day suspension that was reduced to

a written reprimand.[19]

After Moore and the BGA came out in support of Frazier publically,

Moore was shunned by other officers.  He would come to the morning

_____

[18]Moore testified that he heard Caucasian officers say that they had seen the
questions ahead of time.  Id. at 33, 35-37.  The statements that other officers made to
each other are hearsay.

[19]A Caucasian officer named Flynn told Moore that Flynn had also sprayed pepper
spray in an emergency room, but was not disciplined.  Id., at 42-45, 59.  This is hearsay
and cannot be considered.  The proper way to have presented this information would
have been through deposition testimony of Flynn or an affidavit from Flynn.

47

squad meeting and have to sit by himself.  He used to think to himself, "do I stink or do I got some kind of disease?"  Id., at 20-23.  He said that it was hell.  Id., at 23, 55-56, 62.  Moore observed Caucasian officers showing disrespect for Sergeants Joy and Davis.  He heard derogatory comments about Joy, and observed Caucasian officers bypassing Davis and going to Caucasian Sergeants.  Moore decided not to apply for the Sergeant position because he saw the disrespect given to Davis and Joy.  Id., at 11-17.  Finally, Moore states that he was placed on a committee to study off-duty work by officers.  He states that the chairman of the committee, Assistant Chief Caldwell, treated him differently than the other officers on the committee. Id., at 26-28.  Caldwell only directed questions and comments to the Caucasian members of the committee and would only hand out materials to Caucasian members of the committee.  Id., at 27-28.

CITY AND RACE RELATIONS

The Plaintiffs present evidence that the City currently, and historically, has employed very few African Americans as police officers.  In 1981, the Department had a force of one hundred seventy officers, approximately twenty-five of whom were African Americans.  Davis Deposition, at 142-43.  The Department hired a total of four African

American officers in the 1980's.  Id., at 143-44.  In 1991, the City adopted an affirmative action plan to hire more African American officers.  Response, Exhibit 12, City Ordinance 997-12-91.  The plan set a goal of having an employee profile that reflected the minority and female workforce population.  Id., at 3.  In the mid-1990's, the Department had an African American Police Chief, Harvey Davis, the brother of Plaintiff Davis.  Response, Exhibit 26, Deposition of Robert Williams (Williams Deposition), at 142.  Harvey Davis was Chief in 1994 when the four African American officers were promoted to Sergeant.  Id.  Williams indicated that he believed the Department in 1994 had a racially hostile working environment.  Id.  By the late 1990's, the number of African American officers had fallen to nine.  Davis Deposition, at 144-45.

In 2000, the NAACP filed a Title VII action in this Court against the City alleging racial discrimination in hiring in the Department and in the City's Fire Department.  NAACP v. City of Springfield, Case No. 00-3136.  The City and the NAACP settled the suit through the entry of a Consent Decree.  Response, Exhibit 11, Consent Decree entered September 5, 2001.  Under the Consent Decree, the City agreed to try to hire more African American police officers so that the percentage of the total force reflected

the percentage of African Americans in the Springfield labor force.  Id., ¶ 10.

Since the Consent Decree, the City has not appreciably increased the number of African American officers in the Department.  Response, Exhibit 2, Deposition of Donald Kliment dated June 20, 2006, at 25.  As of June 16, 2005, the City had twelve African American officers on a force of 272 officers.  Response, Exhibit 17, Deposition of Donald Kliment dated June 16, 2005, at 24.  Current Mayor Tim Davlin stated that the City's efforts to recruit minority officers have been a complete failure.  Response, Exhibit 9, Deposition of Timothy Davlin, at 42-43.  Deputy Chief Williams stated that the Department's Minority Recruitment Committee (Recruitment Committee) was in shambles.  Williams Deposition, at 122.  Kliment also stated that the City's recruiting efforts have not increased the number of minority candidates.  Deposition of Donald Kliment dated June 16, 2005, at 26, 35-36.

As additional evidence, the Plaintiffs note that in November 2002, then Mayor Karen Hasara stated in a public meeting of the City Council that she believed that there was racism in the Department.  Deposition of Donald Kliment dated June 16, 2005, at 62-63.  She later told Davis, Ralph Harris, and Don Ewing, another African American officer, that some of her

50

white friends had said that she was doing too much for black officers.  <u>Ralph Harris Deposition</u>, at 33.  The City also agreed to provide the NAACP with semi-annual reports on compliance with the Consent Decree.  Some of the reports were not sent in a timely manner.  <u>Response</u>, Exhibit 10, <u>Johnson Letter dated May 12, 2005</u>, at 1.  On August 24, 2005, Springfield Alderman Frank McNeil wrote representatives of the United States Department of Justice, Civil Rights Division, to request an investigation of the Department's hiring and promotion practices.  <u>Response</u>, Exhibit 5, <u>McNeil Letter dated August 24, 2005</u>.

<u>ANALYSIS</u>

All Plaintiffs claim that they have been subjected to racial discrimination in the form of disparate treatment in employment (such as denial of promotion, or demotion) because they are African Americans.  Davis, Officer Harris and Joy claim that the Defendants retaliated against them for speaking out on racial issues within the Department and the City.  Finally, Officer Harris, Joy, Holman and Moore claim that they have been subjected to a racially hostile work environment.  The Defendants move for summary judgment on all claims.

At summary judgment, the Defendants must present evidence that

51

demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to each Plaintiff.  Any doubt as to the existence of a genuine issue for trial must be resolved against the Defendants.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once the Defendants have met their burden, each Plaintiff must present evidence to show that issues of fact remain with respect to an issue essential to his or her case, and on which he or she will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Title VII provides: "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1).  This provision prohibits both disparate treatment in employment and racially hostile work environments.  Title VII also protects employees from retaliation.  The act provides that "[I]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this

subchapter . . . ."  42 U.S.C. § 2000e-3(a).  An individual who believes that

he has been discriminated or retaliated against is entitled to bring a charge

before the EEOC and a law suit against his employer if the EEOC does not

resolve the matter.  42 U.S.C. 2000e-5.

Section 1981 states that every person "shall have the same right. . . to

make and enforce contracts . . . as is enjoyed by white citizens . . . ."  This

section further provides that the term "make and enforce contracts" includes

"the enjoyment of all benefits, privileges, terms, and conditions of the

contractual relationship."  42 U.S.C. §§ 1981 (a) & (b).  The section has

been interpreted to prohibit race discrimination in employment

relationships.  See e.g., Scaife v. Cook County, 446 F.3d 735, 738-39 (7th

Cir. 2006).  Individuals who believe that they have been discriminated

against in a contractual relationship may bring an action in federal court.

See e.g., Jett v. Dallas Independent School Dist., 491 U.S. 701 (1989).

Section 1981 normally imposes liability on the individual who

committed the discriminatory acts. Jett, 491 U.S. at 731-32.  In this case,

the Plaintiffs have brought the § 1981 action against the City and Chief

Harris.  To prevail against the City, each Plaintiff must not only prove racial

discrimination, but must also prove that the City had so firmly entrenched

the practice of racial discrimination that the practice had become a policy, practice or custom of the City that had the force of law. Smith v. Chicago School Reform Bd. of Trustees, 165 F.3d 1142, 1148 (7th Cir. 1999).

Section 1983 provides that "Every person who, under color of any statute, . . . subjects . . . any. . . other person . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." In this case, the Plaintiffs claim that the Defendants discriminated against them because of their race. Davis, Officer Harris, and Joy claim that the Defendants retaliated against them for exercising their First Amendment rights by speaking out as citizens on racial issues in the Department that were issues of public concern. See Connick v. Myers, 461 U.S. 138, 146 (1983).

Section 1983, like § 1981, generally imposes liability on the individual who violated the plaintiff's rights. Monell v. Department of Social Services of City of New York, 436 U.S. 658, 694 (1978). The Defendants brought the action against the City and Chief Harris. Like the § 1981 claim, each Plaintiff in his or her § 1983 claim against the City must show that the practice of racial discrimination and retaliation had become a policy, practice or custom of the City that had the force of law. Gable v. City of

<u>Chicago</u>, 296 F.3d 531, 537 (7th Cir. 2002).

Disparate treatment in employment is often hard to prove.  Thus, the courts have developed both direct and indirect methods of presenting evidence at summary judgment to show that issues of fact exist.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  At any trial, however, a plaintiff bears the burden to prove racial discrimination and retaliation.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 511 (1993).  The Plaintiffs may use either the direct or indirect method to show that issues of fact exist on their Title VII disparate treatment claims in Count I, their § 1981 disparate treatment claims in Count II, and their § 1983 disparate treatment claims in Count II.  <u>Scaife</u>, 446 F.3d at 739; <u>Forrester v. Rauland-Borg Corp.</u>, 453 F.3d 416 (7th Cir. 2006); <u>Eiland v. Trinity Hosp.</u>, 150 F.3d 747, 750 (7th Cir. 1998); <u>Stone v. City of Indianapolis Public Utilities Div.</u>, 281 F.3d 640 (7th Cir. 2002); <u>Riordan v. Kempiners</u>, 831 F.2d 690, 695-96 (7th Cir. 1987).  Davis, Joy and Officer Harris may also use either the direct or indirect methods of proof to show that issues of fact exist on each of their Title VII retaliation claim.  <u>Stone</u>, 281 F.3d at 644.

To establish disparate treatment under the direct method, a plaintiff presents direct evidence that he suffered an adverse employment action and

that his race was a motivating factor.  An adverse employment action is a loss of compensation or benefits, such as demotion or denial of promotion, or a material reduction in duties and responsibilities.  <u>Smart v. Ball State University</u>, 89 F.3d 437, 441 (7th Cir. 1996).  Furthermore, direct evidence means evidence that establishes each element without resort to inferences from circumstantial evidence.  <u>Stone</u>, 281 F.3d at 644.

If a plaintiff does not have direct evidence of disparate treatment, which is usually the case, he or she may proceed at summary judgment under the indirect method. In a disparate treatment case, a plaintiff must present evidence of a <u>prima</u> <u>facie</u> case that: (1) he or she is a member of a protected class; (2) he or she was meeting the employer's reasonable expectations; (3) despite this, he or she suffered an adverse employment action; and (4) a similarly-situated person outside of the protected class was treated more favorably.  <u>See</u> <u>Gorence v. Eagle Food Center, Inc.</u>, 242 F.3d 759, 765 (7th Cir. 2001).  To be similarly-situated, a person must be directly comparable in all respects.  <u>Burks v. Wisconsin Dept. of Transp.</u>, 464 F.3d 744, 751 (7th Cir. 2006).  Relevant factors to show this include whether the employees reported to the same supervisor, whether they were subject to the same standards and whether they had comparable education, experience,

and qualifications.  Id.

Once a plaintiff has met this burden, the defendant must present a valid non-discriminatory reason for the decision.  If that is done, then the plaintiff must present evidence that the stated reason is a pretext.  Gorence, 242 F.3d at 765.  A pretext is a lie.  The plaintiff, therefore, must present evidence that the stated reason is not the true reason for the actions; it is not sufficient to prove that there is no factual basis for the stated reason or the stated reason was not sufficient to motivate the action.  The plaintiff must show that the stated reason is false.  Forrester, 453 F.3d at 418-19.  Again, the indirect, burden shifting method of analysis is used at summary judgment to establish that issues of fact exist.  At trial, any presumptions fall away, and the plaintiff has the burden to prove discrimination and retaliation.  Hicks, 509 U.S. at 511.

To establish Title VII retaliation under the direct method, a plaintiff must present evidence that he opposed actions that he believed violated Title VII, and as a result, suffered an adverse retaliatory action.  Stone, 281 F.3d at 644.  A plaintiff does not need to present evidence that the acts that he challenged actually violated Title VII, only that he reasonably believed that the acts violated Title VII.  Hamner v. St. Vincent Hosp. and Health

Care Center, Inc., 224 F.3d 701, 707 (7th Cir. 2000). An adverse retaliatory action is a materially adverse action that would dissuade a reasonable worker from making or supporting a charge of discrimination. Burlington Northern and Santa Fe Ry. Co. V. White, __ U.S.__, 126 S.Ct. 2405, 2415 (2006).

A plaintiff who claims retaliation under the indirect method must present evidence that: (1) he opposed actions that he believed violated Title VII; (2) he was subjected to an adverse retaliatory action; (3) a similarly-situated employee who did not engage in a protected activity was not subjected to an adverse retaliatory action; and (4) he was performing his duties satisfactorily. Stone, 281 F.3d at 644. If he presents evidence that would establish this prima facie case, then the defendant must present a valid, non-retaliatory reason for the employment decision. Id. The plaintiff must then present evidence that the stated reason is a pretext. Id.

To establish a racially hostile work environment, each Plaintiff bringing this claim must show that he or she: (1) was subjected to unwelcome harassment; (2) the harassment was based on race; (3) the harassment was severe and persuasive so as to alter the conditions of that Plaintiff's employment and create a hostile or offensive work environment;

and (4) there is a basis for employer liability.  Parkins vs. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1032 (7th Cir. 1998).  In assessing the severity and pervasiveness of the Defendant's conduct, the Court looks to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Smith v. Sheahan, 189 F.3d 529, 5 33-34 (7th Cir. 1999).  The Court must apply both an objective and subjective standard.  Each Plaintiff's evidence must indicate both that: (1) a reasonable person would perceive his or her environment to be hostile or abusive, and (2) that each Plaintiff subjectively perceived the environment to be so.  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

To establish a § 1983 First Amendment retaliation claim, Davis, Officer Harris and Joy must each present evidence that he or she spoke out as a citizen on matters of public concern, and the Defendants retaliated against him or her for exercising these First Amendment rights. See Garcetti v. Ceballos, __ U.S.__, 126 S.Ct. 1951, 1957 (2006).  Davis, Officer Harris, and Joy must also present evidence of a causal connection between the

speech and the retaliation.  The protected speech must also be a substantial or motivating factor for the retaliation.  <u>Massey v. Johnson</u>, 457 F.3d 711, 717 (7th Cir. 2006).  Public employees who speak out as part of their employment duties are not speaking as private citizens, and so, cannot proceed with First Amendment retaliation claims.  <u>Garcetti</u>, 126 S.Ct. at 1960.  The § 1983 retaliation claims against the City also require evidence that the discrimination or retaliation was done pursuant to a City policy, practice, or custom.  <u>Monell</u>, 436 U.S. at 694.  Each Plaintiff's claims are evaluated on the evidence that has been presented and the criteria required under the legal theories that were advanced.  The same evidence may be sufficient to create issues for trial under one legal theory but not under another.

<u>RICKEY DAVIS</u>

     1.   <u>Stringer Investigation</u>

Davis' problems started with investigating the Stringer death in 1993. Officers retaliated against him and Officer Harris for conducting the investigation and for their conclusions.  The Title VII anti-retaliation provision, quoted above, prohibits retaliation against a person who opposes a practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a).  Stringer's

60

death did not concern employment discrimination, so Davis' investigation and findings about his death did not oppose a practice made unlawful by Title VII. Therefore, Davis has no Title VII retaliation claim based on the Stringer investigation.

Davis also has no § 1983 retaliation claim. The First Amendment protects employees from retaliation if the employee speaks out as a citizen on matters of public concern. Davis and Officer Harris were assigned to investigate Stringer's death. They, therefore, were not speaking out in their capacities as private citizens, but rather they were performing their duties as police officers when they found that Caucasian officers caused Stringer's death. The Supreme Court recently confirmed that public employees who speak out as part of their employment duties are not speaking as private citizens and cannot proceed with First Amendment retaliation claims. Garcetti, 126 S.Ct. at 1960. Davis has no retaliation claim based on fulfilling his assignment to investigate Stringer's death.

2.    1994 Promotion to Sergeant

The evidence about the 1994 Sergeant's examination shows that Davis spoke out about an employment issue, but he does not present evidence of any employment discrimination or retaliation directly connected to the

promotion.  Rather, Davis applied for Sergeant, spoke out along with other members of the Ethical Society, and prevailed.  He was promoted.  He identifies no discrimination or retaliation that occurred at this time.  Davis clearly advocated for himself and the African American officers who wanted a promotion, but he did not suffer at this time because of this.

       3.     <u>Transfer from Major Case Unit to Criminal Investigations Desk</u>

In 1995, Davis was transferred from the Major Case Unit to the Criminal Investigations Desk assignment.  Davis testified that this transfer was a demotion.  Davis, however, retained his rank of Sergeant.  Normally, a change in assignment without change in rank is a lateral transfer and is not an adverse employment action.  <u>E.g.</u>, <u>McKenzie v. Milwaukee County</u>, 381 F.3d 619, 625 (7th Cir. 2004).  In this case, however, Davis testified that his duties were significantly curtailed.  He went from supervising Detectives handling homicide cases to reading closed files.  A significant reduction in responsibilities can constitute an adverse employment action.  <u>Smart</u>, 89 F.3d at 441.  The reduction in Davis' responsibilities creates an issue of fact regarding whether the transfer was an adverse employment action.

Davis has no direct evidence that the transfer was either racially

motivated or in retaliation for speaking out about racial issues, such as the 1994 promotion controversy. To make a direct method <u>prima</u> <u>facie</u> case, Davis must present evidence that shows a causal connection without resort to inference or presumption. <u>Stone</u>, 281 F.3d at 644. He has not presented such evidence. In fact, Davis identifies no evidence of a causal connection other than the sequence of events, i.e., the transfer occurred after the 1994 Sergeant controversy. The sequence of events, alone, is not sufficient evidence of a causal connection to overcome summary judgment. <u>Sauzek</u> <u>v. Exxon Coal USA, Inc.</u>, 202 F.3d 913, 918 (7th Cir. 2000).

Thus, Davis must present a <u>prima</u> <u>facie</u> case under the indirect method for his disparate treatment and Title VII retaliation claims. Under the indirect method, he must present evidence of a similarly-situated person who was treated more favorably and who either: (a) was outside of the protected class for his disparate treatment claim, or (b) did not speak out to oppose a Title VII violation, in the case of his retaliation claim. He has presented no evidence regarding the assignments of any other Sergeants at the time that he was transferred to the Criminal Investigations desk. Without this evidence, he cannot make out a <u>prima</u> <u>facie</u>, indirect case of disparate treatment or Title VII retaliation.

63

Davis also does not have evidence for a § 1983 retaliation claim for violation of his First Amendment rights.  Davis must show a causal connection between speaking out as a citizen on a matter of public concern and the retaliatory act.  <u>Massey</u>, 457 F.3d at 717.  Davis has presented no evidence of a causal connection.  He therefore has failed to present evidence which, if believed by a jury, would establish a § 1983 retaliation claim.

4.    <u>1996 Transfer to Patrol</u>

In 1996, Davis was transferred from Criminal Investigations to Patrol. He again claims that was a demotion, even though he retained his rank of Sergeant.  He testified that his compensation was reduced because officers in Criminal Investigations received a clothing allowance, and patrol officers did not.   He also states that the transfer resulted in a reduction in responsibility, although he is not very clear about how his desk assignment had greater responsibility.   Current Chief Kliment also testified that assignment to Criminal Investigations was considered a promotion within the Department.  <u>Response</u>, Exhibit 17, <u>Deposition of Donald Kliment</u>, at 97.  Given the evidence of a reduction in compensation, there is at least some evidence that the transfer may have been an adverse employment action.

Davis, however, still has no direct evidence that the transfer was either racially motivated or in retaliation for speaking out about Title VII violations or matters of public concern.  As with the transfer to the Criminal Investigations desk position, therefore, Davis has no evidence of a § 1983 claim for retaliation in violation of his First Amendment rights and no case of disparate treatment or Title VII retaliation under the direct method of proof.

Davis has presented evidence of a prima facie case under the indirect method of analysis.  Davis has evidence that creates an issue of fact as to whether he was demoted through the transfer to Patrol, while a similarly-situated Caucasian Sergeant was treated more favorably.  Davis identifies then Sergeant Kliment as a Sergeant who was not transferred during Chief Harris' tenure with the Department.  Chief Harris stated that he regularly transferred Sergeants to different divisions in order to cross-train them.  This evidence indicates that, for purposes of transfers, Chief Harris would have been the supervisor for both Davis and Kliment, and they were subject to the same standards for transfers for cross-training.  Thus, a jury could conclude that they were similarly-situated, but Kliment was never transferred.

The Defendants state that the non-discriminatory reason for Davis' transfer was Chief Harris' policy of transferring Sergeants to different divisions in order to cross-train them.  The fact that Kliment was not transferred calls into question the truthfulness of the stated reason.  If Chief Harris wanted to cross-train Sergeants, one would have expected Kliment to have been transferred at least once during Chief Harris' tenure.  This inconsistency creates an issue of fact concerning whether the stated reason for the transfer is a pretext.  Davis, thus, may proceed to trial with his disparate treatment claims and his Title VII retaliation claim relating to the 1996 transfer to Patrol.  As discussed below, however, Davis does not show a basis for municipal liability for his §§ 1981 and 1983 claims concerning this transfer.  Davis may proceed on those claims only against Chief Harris.

5.    1997-2001 IA Complaints

Davis states that, from 1997-2001, he was subjected to numerous IA complaints.  As before, he has no direct evidence of any causal connection between these investigations and any actions taken by him to speak out about racial discrimination.  He again has no § 1983 retaliation claim and no evidence of disparate treatment or Title VII retaliation under the direct method of proof.  The filing of an IA complaint, alone, also is not an adverse

66

employment action and so does not show any disparate treatment.  <u>Lucas v. Chicago Transit Authority</u>, 367 F.3d 714, 731 (7th Cir. 2004).  Davis also has no evidence that any similarly-situated non-minority officers received fewer IA complaints than he.  He therefore has no <u>prima</u> <u>facie</u> indirect case concerning these complaints.

6.   <u>1997-2002 Denial of Transfer</u>

Davis states that, from 1997-2002, he applied for openings in Criminal Investigations, but in each case, less qualified Caucasian officers were selected.  <u>Davis Affidavit</u>, ¶¶ 77-78, 124; <u>Second Davis Affidavit</u>, ¶ 5.  Davis identifies several specific Sergeants and Lieutenants who received the Criminal Investigations assignment, but who had less experience in investigations than he.   Davis was at the Department and so had opportunity to know the assignments of these officers, and also, to know the amount of experience each had in investigations.  He, therefore, has a basis in his personal knowledge for these statements.  He could have provided some corroborative evidence, such as personnel records for the officers selected.   But, the Court must look at the evidence in the light most favorably to Davis.  In doing so, the Court finds that he has enough evidence to create an issue of fact regarding disparate treatment and Title

VII retaliation in connection with these transfer denials. The Defendants have not proffered a non-discriminatory reason for these employment decisions, and so Davis may proceed to trial on these claims. As discussed below, however, Davis does not show a basis for municipal liability for his §§ 1981 and 1983 claims with respect to these denials of transfers. Those claims may proceed against Chief Harris only. Finally, he has no direct evidence of a causal connection to any statements by him, and so he has not established factual issues for a § 1983 First Amendment retaliation claim.

7. <u>1999 Lieutenant's Examination</u>

Davis has presented evidence of a <u>prima</u> <u>facie</u> case for disparate treatment in connection with the 1999 Lieutenant's examination. Caucasian Sergeant Pittman was an applicant taking the Lieutenant's examination at the same time. For purposes of taking the examination, Davis and Pittman were similarly-situated candidates eligible to take the Lieutenant's examination. Pittman received more favorable treatment than Davis because a year earlier he had received from Chief Harris a book later designated as one of the study materials for the test, but Davis did not know about the book until sixty days before the test. Pittman finished first on the eligibility list, and Davis finished sixteenth. As a result, Davis had to wait

until 2001 to be promoted to Lieutenant.

Once Davis has presented evidence of a <u>prima</u> <u>facie</u> case, the Defendants must present a valid, non-discriminatory, non-retaliatory reason for the action. Here, Chief Harris states that Keen and Pittman asked him for general suggestions to better themselves, and he suggested the book at issue. Chief Harris states that, at the time, he did not give the book to them to study for the test. Chief Harris, thus, states that this was just a coincidence. Davis presents no evidence to show that Chief Harris is lying. He, therefore, has no evidence of pretext, and so has no claim for either disparate treatment or retaliation based on the 1999 Lieutenant's examination.

8.   <u>January 2001 Letter and February 2001 Reprimand</u>

Issues of fact exist regarding Davis' Title VII retaliation claim for the February 2001 reprimand by Lieutenant Greg Smith. In January 2001, Davis sent a letter to the local NAACP Chapter about difficulties African American officers had experienced getting backup while working off-duty at Mac's Lounge. In February 2001, Smith gave Davis the reprimand for being ten minutes late returning to work after lunch. Davis states that the reprimand was unwarranted. He also states that he regularly observed

Smith leave his shift at 10:30 p.m., when his relief arrived, even though Smith's shift did not end until 12:00 a.m. midnight.  He, thus, showed that an officer in his same division was allowed to take additional time off without consequence.  He has a prima facie indirect case of Title VII retaliation as long as a reprimand is sufficient to constitute an actionable retaliatory act.

The Court believes that it is an issue of fact whether a written reprimand is sufficient to constitute a retaliatory act.  Davis has no disparate treatment claim because a reprimand is not an adverse employment action under Title VII disparate treatment analysis.  Lucas, 367 F.3d at 731. Retaliation, however, does not require proof of an adverse employment action.  Rather, the plaintiff must show a retaliatory act that would dissuade a reasonable person from opposing discrimination or filing a discrimination complaint. Burlington Northern, 126 S.Ct. at 2415.  A written reprimand is part of the progressive discipline process and so would have some effect on Davis' career.  Given that fact, a jury could conclude that the reprimand here could dissuade someone from getting involved in opposing Title VII violations.  Davis, thus, has presented sufficient evidence to create an issue of fact regarding whether he was retaliated against in connection with the

February 2001 reprimand.

The Defendants do not provide a non-discriminatory reason for Lieutenant Smith's actions. Their only responses are that: (1) Davis cannot prove Smith left work early and that the discipline was unwarranted; and (2) Davis has no evidence of a causal connection. Reply, at 51 ¶¶478-81, and at 92-93. However, Davis personally observed Smith leave early. He has personal knowledge of this fact. Davis does not need evidence of a causal connection under the indirect method of proof of Title VII retaliation. Stone, 281 F.3d at 644. Given that Davis has presented evidence that creates an issue of fact regarding whether he suffered retaliation, and the Defendants do not provide a non-discriminatory reason, Davis can proceed to trial on this claim.

Davis, however, also has no § 1983 First Amendment retaliation claim in connection with this reprimand. First Amendment retaliation cannot be established by the indirect method. As such, Davis must have some direct evidence of a causal connection between the January 2001 letter and the reprimand. He has no evidence of a connection other than the sequence of events. That, alone, is not sufficient to overcome summary judgment. Sauzek, 202 F.3d at 918.

9.      Promotion to Lieutenant and Order to Quit Mac's Lounge Job

When Davis was promoted to Lieutenant, Chief Harris ordered him to stop working off-duty at Mac's Lounge.  This was a change in the terms and conditions of Davis' employment that reduced his income.  Chief Harris' order, thus, was an adverse employment action.  Davis has no direct evidence of retaliation or racial discrimination in connection with the directive that he stop working at Mac's Lounge.  He, thus, must present evidence of more favorable treatment given to other similarly-situated non-minority Lieutenants, or similarly-situated Lieutenants who did not speak out against racial discrimination.   He states in his Affidavit that two Caucasian Lieutenants worked off-duty at a motel and a restaurant.  Davis Affidavit, ¶¶ 94.  He presents no evidence to explain how he has personal knowledge of these facts.  The Court therefore allowed the Defendants' Motion to Strike this part of the Affidavit.  Since he has no evidence of the treatment of any similarly-situated Lieutenant, he has not presented evidence of an indirect case.

Even if he had personal knowledge that the other Lieutenants were allowed to work at a restaurant and a hotel, the Defendants have a valid non-discriminatory reason for the action.  Chief Harris did not want a

Department Lieutenant, a high level management official, working in a bar. Davis has not shown that this reason was a pretext. Thus, even if Davis made out a prima facie case, the Defendants are entitled to summary judgment on this claim.

10.  Lieutenant Watch Assignments

Davis complains that after he was promoted to Lieutenant, he requested the second watch, but he was assigned to the third watch, essentially the midnight shift. Davis states that Assistant Chief Burton told him assignments were based on seniority. Second Davis Affidavit, ¶ 20. Later, two Caucasian Lieutenants who were promoted after Davis were assigned to the second watch, the evening shift. Id. Shift assignments are not adverse employment actions, so Davis has no disparate treatment claim. See e.g., Griffin v. Potter, 356 F.3d 824, 829 (7th Cir. 2004). Davis also has no evidence of a causal connection with any statements by him and the shift assignment, and so, has no § 1983 First Amendment retaliation claim. Relegation to the midnight shift, however, may be sufficient to dissuade a reasonable person from getting involved in opposing a Title VII violation. Burlington Northern, 126 S.Ct. at 2415. There is at least an issue of fact on this point. The City, again, has not offered a non-discriminatory reason

73

for this decision.    Davis, therefore, may proceed with his Title VII retaliation claim against the City on this issue.

11.   <u>August 2002 Discipline</u>

In August 2002, Chief Harris publically disciplined Davis for not following proper procedures in the preparation of reports.  Chief Harris did this in a meeting with other Lieutenants, which humiliated Davis.  Davis states that he followed the procedures for preparing the reports given to him by his supervisor, Assistant Chief Hughes.  As with the February 2001, reprimand, Davis has presented enough evidence under the indirect method to show that issues of fact exist regarding whether Chief Harris' actions constituted retaliation under Title VII.  The fact that Davis' supervisor, a Caucasian Assistant Chief, told Davis that he was following correct procedures could show that others who did not oppose racial discrimination were treated more favorably.  His supervisor presumably followed these procedures and was not publically humiliated by Chief Harris.  The Defendants have not proffered a non-retaliatory reason for Chief Harris' actions. Davis, thus, may go to trial on this Title VII claim.  Davis, again, has no direct evidence of a causal connection with his efforts to oppose discrimination and the discipline.  He, therefore, does not have evidence of

a § 1983 First Amendment retaliation claim.

12.   <u>October 2002 Surveillance</u>

Davis has presented enough evidence to show a <u>prima</u> <u>facie</u> indirect case of Title VII retaliation in connection with the surveillance on October 29, 2002.   Davis spoke out on many issues related to employment discrimination prior to the surveillance.  The surveillance was not an adverse employment action, so Davis has no disparate treatment claim.   The surveillance, however, could dissuade a reasonable person from opposing Title VII violations, and so, could be an adverse retaliatory act.  The IA officers put a tracking device on his car and followed him around.  They followed him at the instructions of Chief Harris.  They never followed anyone else under investigation like this except Frazier, another African American officer.  A jury could conclude that officers under investigation who were Caucasian or who did not oppose discrimination were treated more favorably.   Davis, thus, has enough evidence to show possible retaliation.

The City, however, offers a non-retaliatory reason for its actions this time.  The City states that the Department was investigating whether Davis was disappearing during his shift to visit his girlfriend.  Davis does not

present evidence that this reason is a pretext.  He presents information found during discovery in this case that other officers may have engaged in misconduct during working hours, but he has no evidence that the Department leaders were on notice of this misconduct.  Without notice, there is no evidence that the Department treated Davis differently than it would have treated others similarly-situated.  Given the absence of evidence of pretext, the City is entitled to summary judgment on this aspect of Davis' claim.

13.   <u>Miscellaneous Davis Claims</u>

Davis mentioned some other matters that do not state claims.  He complains that Pittman yelled at him and cursed at him after he came back from his June 2002, meeting with the Department of Justice.  Yelling and cursing is not actionable under Title VII or §§ 1981 and 1983.  Officer Harris complains that he and Davis received PPCT training, but they were never asked to teach this material.  There is no evidence that either Davis or Officer Harris ever applied to teach, and so, there is no evidence of any wrongful conduct by the Department.  Further, there is no evidence that a teaching assignment was a promotion.  Davis complains that he was reprimanded once for improperly booking evidence, but he gives no time-

frame for this event.  Without a time frame, Davis cannot show retaliation because he cannot show that the discipline was in response to anything Davis said or did to challenge discrimination.  Also, as discussed above, a written reprimand is not an adverse employment action.

Finally, Davis states that he has been subjected to "nigger" jokes throughout his career.  This fact does not constitute retaliation because the jokes were not in response to anything Davis said or did to challenge discrimination.  Rather, he states the jokes were a fact of life from the day he began at the Department.  These jokes are also not adverse employment actions that are actionable as disparate treatment.  The jokes might well be actionable as creating a hostile work environment; however, Davis did not allege anything about these jokes, or about a hostile work environment, in the Complaint.  He cannot use the summary judgment brief to attempt to amend his claim to add this claim now.  Speer, 123 F.3d at 665.

Davis, therefore, has shown the existence of issues of fact for trial for: (1) his disparate treatment and Title VII retaliation claims against the City and his §§ 1981 and 1983 claims against Chief Harris based on: (a) the 1996 transfer from Criminal Investigations to Patrol, and (b) the 1997 to 2002 denial of transfers to Criminal Investigations; and (2) his additional

77

Title VII retaliation claims against the City based on: (a) the February 2001 reprimand, (b) the assignment to the third watch as a Lieutenant, and (c) the August 2002 reprimand.   The Defendants are entitled to partial summary judgment on all of Davis' other claims.

RALPH HARRIS

    1.    Hostile Work Environment

Unlike Davis, Officer Harris asserted a claim for a hostile work environment.  Hostile work environment claims are different from disparate treatment or retaliation claims because the issue is not whether particular acts constitute employment discrimination or retaliation, but whether the overall environment in which Officer Harris worked was illegally and racially hostile.  Officer Harris must present evidence of an environment that he personally found to be pervasive, racially hostile and abusive, and also, evidence of an environment that would objectively be considered a pervasively racially hostile and abusive environment.  Faragher, 524 U.S. at 787; Sheahan, 189 F.3d at 534.  Isolated, sporadic racial comments are insufficient to meet this objective test.  McKenzie, 381 F.3d at 625.

Officer Harris has presented evidence that he subjectively believed he worked in a racially hostile work environment, but he has failed to present

sufficient evidence to show a hostile work environment under the objective test.  He presents evidence that he heard one Caucasian officer use the term "nigger" in 1978 to describe a suspect.  This is the only evidence of anyone in the Department using a racially offensive term in his presence.  A single use of a racially abusive term from 1978 to January 2003 is not sufficient to show a racially hostile environment.

Officer Harris states that Caucasian officers wrote down automobile license plates numbers of individual who attended a meeting of the Ethical Society.   This event, even combined with the 1978 racial epithet, constitutes, at best, isolated and sporadic acts of racial hostility, not a pervasively hostile, abusive environment.

Officer Harris has also presented evidence of severe hostility toward him personally, but he has not presented evidence to show that the hostility was racially motivated.  He presented evidence that somebody repeatedly, over the course of his career, spat on his assigned Department vehicle, dented his assigned vehicle, and cut notches out of the steering wheel in his assigned vehicle.  He also presented evidence that somebody plugged up the barrel of his carbine.  These are clearly vicious, hostile acts.  The problem is that Officer Harris presents no evidence to indicate who did these things,

or why.  He, thus, has no evidence that these acts were racially motivated. Without some additional evidence, Officer Harris fails to show a racially hostile environment.  The Defendants are therefore entitled to summary judgment on Officer Harris' hostile work environment claims.

2.    The Stringer Investigation

Officer Harris also presents evidence of retaliation against Davis and him for their investigation of Floyd Stringer's death.  As explained above, the Stringer death did not concern Title VII employment discrimination issues, and Officer Harris was performing assigned duties and not speaking out as a citizen.  He therefore does not have a retaliation claim based on these events.  See Garcetti, 126 S.Ct. at 1960.

3.    1996 Transfer from Planning and Research to the Streets

Officer Harris repeatedly fails to present evidence of the treatment of similarly-situated officers, and this failure dooms his disparate treatment and retaliation claims.  In 1996, Officer Harris presents evidence that he was transferred from Planning and Research to the streets, presumably Patrol.  He does not present evidence of differences in compensation, duties or responsibilities between these two assignments.  He, thus, fails to show that this was an adverse employment action.  Officer Harris, further, has no

evidence that officers who were Caucasian or who did not oppose discrimination were treated more favorably.[20]  He, therefore fails to state a prima facie indirect case of disparate treatment or Title VII retaliation.

Officer Harris also has no direct evidence of discriminatory or retaliatory motives for the transfer.  The sequence of events, after the 1994 controversy over the Sergeant promotions, is not sufficient, alone, to show causation.  Sauzek, 202 F.3d at 918.  The Defendants are entitled to summary judgment on this claim.

4.  Officer Harris' Vehicles

Officer Harris states that he was assigned a "raggedy" squad car when he was transferred to the streets.  Assignment of a "raggedy" car is not an adverse employment action for disparate treatment analysis.  Arguably, the assignment might dissuade a reasonable person from opposing Title VII violations.  Even so, Officer Harris presents only his general statements that similarly-situated officers were treated better.   His generalized, uncorroborated statements are insufficient to establish this element of a

---

[20]Officer Harris cannot look to Kliment as a similarly-situated officer who was treated more favorably.  Kliment and Davis were similarly-situated because both were Sergeants and subject to Chief Harris' policy of cross-training Sergeants.  Officer Harris was a patrol officer and so not subject to the same supervisor or same policies.  See Burks, 464 F.3d at 751.

prima facie indirect case.  <u>Oest</u>, 240 F.3d at 614.  Officer Harris also has no direct evidence of either discrimination or retaliation.

    5.    <u>2000 Sergeants' List</u>

Officer Harris complains that Chief Harris could have extended the Sergeants' list in 2000, but he did not.  Officer Harris states that he would have been promoted had Chief Harris done so.  This evidence fails to show a claim for either disparate treatment or retaliation.  Officer Harris presents no evidence that he was adversely affected by Chief Harris' decision; he presents no personnel records or other competent evidence of the number of Sergeant promotions in the subsequent year to show that he would have been promoted had the list been extended.  He also presents no evidence that Chief Harris' decision favored similarly-situated Caucasian officers, or an officer who did not speak out on employment discrimination issues.  Presumably, the Caucasian officers on the list also lost the opportunity for a promotion to Sergeant, and so, were not treated more favorably than Officer Harris.  Absent evidence of a similarly-situated person who was treated more favorably, Officer Harris does not make out a <u>prima</u> <u>facie</u> case of either disparate treatment or retaliation.  Harris also has no evidence of a causal connection between Chief Harris' decision and any statement by

Officer Harris opposing racial discrimination.  Officer Harris, therefore, has no evidence of a § 1983 First Amendment retaliation claim based on this incident.

### 6.   Sick Leave Investigations and Discipline

Officer Harris complains about the investigation and discipline for his use of sick leave in October 2001 and June 2002.  He, again, provides no evidence that similarly-situated Caucasians, or individuals who did not speak out on racial matters, were treated more favorably.  He states that Caucasians abused sick leave, but were not disciplined.  He also wrote a memo on the subject.  Officer Harris did not submit any corroborative evidence.  His conclusory assertions are not sufficient.  Oest, 240 F.3d at 614.  Officer Harris also has no evidence of causation necessary to establish a § 1983 First Amendment retaliation claim.

### 7.   Corn IA Investigation

Officer Harris complains that he was subjected to an IA investigation and reprimand for failing to prepare a report of the theft of Corn's wallet. He has presented the elements to establish issues of fact for a prima facie indirect Title VII retaliation claim.  He was reprimanded, but a Caucasian officer, Selvaggio, was not investigated.  They were similarly-situated in that

they both were assigned to the desk on November 15, 2001, at the time that Corn called, and both failed to file a report. As explained above, Officer Harris does not have evidence of a disparate treatment claim because a reprimand is not an adverse employment action. Officer Harris also does not have evidence of a causal link between his statements against racial discrimination and the investigation and reprimand. He, thus, does not have evidence of a § 1983 First Amendment retaliation claim.

The Defendants have submitted the record of the Corn investigation to show that the reprimand was given because Officer Harris violated the rules by failing to file a report. This is a valid non-retaliatory reason for the Department's action. Officer Harris does not present evidence that this reason for the reprimand was a pretext. This IA investigation was initiated following a citizen's complaint. Officer Harris was the one who took the initial call from the citizen, and he was the one the citizen claimed had told her to climb into a dumpster to look for the wallet. Officer Harris' involvement with the aggrieved citizen was more substantial than Selvaggio's. Officer Harris violated the rules by failing to prepare the report. Given the lack of evidence to show pretext, the Defendants are entitled to summary judgment on this claim.

8.    <u>Miscellaneous</u>

Officer Harris raises a number of other matters without giving any time frame.  Officer Harris complains that he did not receive his request to work in dispatch, and he complains that he was taken out of the gang unit. Lateral transfers are not adverse employment actions.  <u>McKenzie</u>, 381 F.3d at 625.  Since he presents no time frame, he has no evidence that any of these acts happened after he opposed racial discrimination in the Department.  He, thus, has no evidence that these acts were retaliatory.

Officer Harris complains about his transfer to the streets after the IA investigation of his domestic battery charge.  He again claims that Caucasian officers were treated differently, but he presents no evidence other than his characterization of records he reviewed.  He did not submit the records.  <u>See</u> <u>Oest</u>, 240 F.3d at 614 (generalized, conclusory statements are not sufficient at summary judgment).  He, therefore, cannot make out a <u>prima</u> <u>facie</u> case of disparate treatment.

Officer Harris states that, after he spoke out in support of Frazier, he was subjected to more IA complaints than he had been subjected to in the previous twenty years.  He gives no evidence of any of these complaints, other than the ones discussed above.  He also gives no evidence of the

85

treatment of similarly-situated officers who did not speak out. He, therefore, fails to overcome summary judgment on these claims.

LEA JOY

1.    Hostile Work Environment

Joy presents evidence of racially hostile acts during her tenure at the Department. The Chief told her in the mid 1980's that some unidentified person referred to her as an "African cunt." Also, a Caucasian officer, Sandy Vacker, made a joke about Joy leaving chicken grease on the steering wheel. Joy said the chicken grease comment followed her for twenty years. A jury could conclude that the reference to chicken grease was racially hostile, and the other comment is clearly racially hostile.

She also has evidence of other demeaning or antagonistic behavior. Officers referred to her as "Ms. Joy" instead of by her rank. No officer wanted to be her partner. She was ignored at meetings unless she spoke up loudly. During her training, she was not allowed to ask questions. She was given a car that was in very bad condition. Although the time frame over which some of these comments were made is unclear, the totality of them indicate that an issue of fact exists as to whether a reasonable person would have perceived this work environment to be hostile and abusive.

Caucasian officers also made disparaging comments about Joy to other African American officers, notably Holman and Moore.  Such second-hand harassment is not as significant for hostile work environment analysis. Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998).  There is no evidence that the comments were made to Joy, or that Joy was aware of these comments.  However, when combined with the evidence cited above, there are issues for trial on Joy's hostile work environment claim.

2.    Ice Cream Truck

Joy presents evidence that during her training she was assigned to the transport truck, called the "ice cream truck".  This temporary assignment during training was not an adverse employment action for her disparate treatment claim.  See Quantock v. Shared Marketing Services, Inc., 312 F.3d 899, 903 (7th Cir. 2002).  Joy also presents no evidence of speaking out about racial discrimination at this point in her career, so this is not evidence of any retaliation.  This assignment does not establish a claim.

3.    Canine Unit

Joy presents evidence that she was not appointed to the Canine unit. There is some evidence that the denial of this appointment was an adverse employment action.  Canine officers received some additional pay to care

87

for the dogs in off-duty hours.  Joy, however, presents no evidence that anyone received the assignment to the canine unit instead of her.  She applied for the unit in 1994, but by May1994, she was promoted to Sergeant and no longer eligible for the assignment.  She says that others were assigned to the canine unit ahead of her before she was promoted to Sergeant, but she gives no details.  She does not establish how she knows that they were appointed before she was promoted to Sergeant.  She does not identify the individuals who were assigned to the canine unit.  She does not present any records to show the dates of their assignment to the canine unit.  In short, she does not present evidence that shows that someone was treated better than she.  Her general statements are insufficient.  Oest, 240 F.3d at 614.

4.     1996 Transfer to Third Watch

In 1996, Officer Harris states that Joy was transferred from crime prevention to the third watch, the midnight shift. A shift change is not an adverse employment action for purposes of disparate treatment analysis. Griffin, 356 F.3d at 829. The shift change, however, might be an adverse retaliatory act because a change to the midnight shift might dissuade a reasonable person from getting involved in opposing Title VII violations. Here, Sergeant Joy's shift changed after she opposed the proposal to limit the number of promotions to Sergeant in 1994. Evidence also establishes that Sergeant Kliment was never transferred by Chief Harris. Chief Harris states in his Affidavit that he transferred Sergeants, so Kliment and Joy would be of the same rank and subject to the same supervisor and terms of employment, for purposes of transfers; Chief Harris' statement at least creates an issue of fact on this point. The fact that Kliment was not transferred also creates an issue of fact regarding whether Chief Harris' explanation was a pretext. Joy may proceed to trial on this Title VII retaliation claim.

Joy has no direct evidence of any causal connection between the 1994 Sergeant promotion controversy and the 1996 shift transfer. Joy, therefore,

has not presented sufficient evidence to proceed with her § 1983 First Amendment retaliation claim.

5.  <u>1997 FATS Training</u>

In 1997, Joy asked to take FATS instructor training, but her request was denied.  She presents no evidence to show that this denial was an adverse employment action for disparate treatment analysis.  She also presents little evidence to show that the denial was sufficiently severe to be actionable as a retaliatory act.  She therefore does not present evidence of a <u>prima</u> <u>facie</u> indirect case of disparate treatment or Title VII retaliation. She also has no direct evidence of a causal connection between her opposition to racial discrimination and the denial of her request for training. She, therefore, has no evidence of a § 1983 First Amendment retaliation claim over this denial.

In addition, the City presents evidence that she was denied FATS training because she previously had received training to be an instructor on MDT equipment, but she then refused to train other officers on the MDT equipment.  She presents no evidence to show that this reason was a pretext.  She admits that she bowed out of providing MDT training because she did not have the equipment in her vehicle.  The Defendants are entitled

to summary judgment on this claim.

### 6.      1999 Lieutenant's Examination

Joy joined Davis to complain about Chief Harris providing a book to officer Pittman who took the Lieutenant's examination with them.  As with Davis, Joy does not have evidence that Chief Harris' explanation of his actions was a pretext.

### 7.      Lieutenant Brunsman's Compensation

Joy complains that Lieutenant Brunsman worked the same assignment as she, but was paid more.  Brunsman was paid more because he had been a commander, but he was then reassigned to the rank of Lieutenant.  This is undisputed.  The Department did not lower Brunsman's pay at the time of the reassignment.  The decision not to lower Brunsman's pay is not an adverse employment action against Joy or a retaliatory act against Joy.[21]

### 8.      Transfer From IA to Field Operations

Joy was transferred from IA to Field Operations after she spoke out

---

[21]This is more properly an Equal Pay Act (EPA) claim.  29 U.S.C. § 206(d); Markel v. Board of Regents of University of Wisconsin System, 276 F.3d 906, 913 (7th Cir. 2002).  Joy has not argued this theory to the Court and so the Court only addresses the theory briefly.  Joy would not prevail on an EPA claim because Brunsman's experience as a commander was a proper justification under the EPA for paying Brunsman more than Joy. Id.  Joy may have elected not to pursue this theory because she recognized that the City had a valid justification for the pay differential.

about the Frazier investigations.  She told Vasconcelles that she did not want to investigate Frazier, and the next day Chief Harris told her she was incompetent and transferred her.  When viewed in the light most favorable to Joy, this is direct evidence of retaliation--that she was transferred because of her opposition to the Frazier investigation.  Joy states that her duties and responsibilities were then curtailed in Field Operations.  She had to get permission from the Assistant Chief for all decisions.  Inferior officers were allowed to bypass her to speak directly to the Assistant Chief.  Joy makes out a direct method prima facie case for Title VII retaliation in connection with this transfer.

Chief Harris states that he did not transfer her because she opposed the Frazier investigation; he transferred her because she refused to follow orders.  Specifically, Joy refused to re-interview Frazier.  However, Chief Harris' explanation only creates an issue of fact because Joy presented direct evidence of retaliation.  Stone, 281 F.3d at 644.  She, therefore, may proceed to trial on this claim.

Joy does not have a direct evidence claim of disparate treatment.  The direct evidence indicates that the transfer occurred because of her opposition to the Frazier investigation, not because she is African American.

She thus, must proceed under the indirect method on her disparate treatment claim. Under this method of analysis, the Defendant can present a valid non-discriminatory reason. In this case, Chief Harris states that he did not transfer her because she opposed the Frazier investigation; he transferred her because she refused to follow orders. Specifically, she refused to re-interview Frazier. Joy fails to show that this reason is a pretext. Joy admits she told Vasconcelles she did not want to conduct the Frazier investigation that was assigned to her. She further told her supervisors that she could not re-interview Frazier because Frazier was on leave. Joy does not explain why Frazier's leave status made her unavailable for an interview. These statements by Joy are largely consistent with Chief Harris' statement that she refused to re-interview Frazier. Joy's statements certainly do not show that Chief Harris is lying about his stated reason. Given that Joy has no evidence that the stated reason is a pretext, the City is entitled to summary judgment on the disparate treatment aspect of her claim.

The Defendants are also entitled to summary judgment on Joy's § 1983 First Amendment retaliation claim. In this case, Joy was assigned to the Frazier investigations. Her statements about the investigation were,

thus, made as part of her duties as an IA officer in the Department.  Since she was speaking as part of her duties, she was not speaking as a citizen and cannot maintain a First Amendment retaliation claim.  Ceballos, 126 S.Ct. at 1957.

      9.    Miscellaneous

As with Davis and Officer Harris, Joy raises other matters without giving any time frame or significant detail.  Without a time frame, Joy cannot show that any of these actions were taken in retaliation for something she did.  She is, thus, limited to presenting this evidence to support disparate treatment claims.  Joy states that she applied for the honor guard and to be a crisis negotiator, but her applications were denied. She presents no evidence to show that these assignments were anything but lateral transfers.  She therefore fails to show that the denial of these assignments constituted adverse employment actions.  Her application to be a Detective was denied.  As discussed above, evidence supports the inference that this denial may have been an adverse employment action. Joy, however, gives no context for the denial and presents no evidence that a similarly-situated Caucasian officer received the assignment.  She therefore fails to present evidence of a prima facie disparate treatment claim.  Last,

Joy states that she was assigned a vehicle in very poor condition. This is not an adverse employment action. See Smart, 89 F.3d at 441. Joy is entitled to proceed to trial on the Title VII retaliation claims based on the 1996 transfer to the third watch and the transfer from IA to Field Operations. The Defendants are entitled to partial summary judgment on all of her remaining claims.

DONALD EWING

1.    Detective Applications

In 1986, Ewing applied to be a Detective. He did not get the assignment, but he states that Caucasian officers that he trained did. He does not identify these officers. He has no direct evidence of racial motivation and so must proceed under the indirect method. That method requires evidence that similarly-situated Caucasian officers were treated more favorably than he.

Ewing has insufficient evidence that the officers who received the assignments in 1986 were similarly-situated with him. He does not tell the Court or the Defendants the identity of these officers. He has no evidence about how his educational background compared to theirs. He also has no evidence about the other officers' experience outside of the Department. He

95

does not present any evidence about the other officers' work history within the Department. He, therefore, does not have enough evidence to show that the officers selected were similarly-situated with him. He fails to present evidence of a prima facie indirect case.

Ewing applied a total of four times to be a Detective, but was denied each time. Ewing provides no evidence about the officers who were selected the other three times that he applied to be a Detective. Ewing, thus, has not presented the evidence required for a prima facie case with respect to those three applications.

2.     1995 NPO Assignment

Ewing mentions his NPO assignment, but he has no evidence of any adverse employment action with respect to it. He applied for the assignment and was selected. He received neighborhood contact information some three days later than his Caucasian counterparts. A three day delay is trivial and not an adverse employment action. Pittman said that they all thought Ewing would fail, but Ewing did not fail, and Ewing took Pittman's statement as an admission by Pittman that Ewing was succeeding at the position. Pittman's comment is not an adverse employment action. After the assignment was completed, Chief Harris

threatened to take Ewing's NPO house away, but he did not.  This again is not an adverse employment action.

    3.   <u>Miscellaneous</u>

Ewing mentions several other matters.  None is evidence of actionable conduct.  Ewing was denied assignment to Beat 300 for three months.  The denial of a particular assignment is not an adverse employment action.  There is no evidence that Beat 300 was a promotion.  Ewing complains about a car assigned to him; this again is not an adverse employment action.  He was given a one-day suspension for having three automobile accidents in one year.  Ewing states that a Caucasian officer named Gillette also had three accidents in a year.  Ewing states, "Well, I think that, I'm pretty sure that Gillette didn't get no days for his accident, but I got days off for my accident."  <u>Ewing Deposition</u>, at 14.  Ewing presents no records or other corroborative evidence.  His belief that they were treated differently is insufficient.  <u>Oest</u>, 240 F.3d at 614.

Finally, Ewing heard officer Kolar use the word "nigger" to describe a suspect and has observed Caucasian officers rough up African American prisoners.  These facts are not evidence that Ewing suffered an adverse employment action.  They may be relevant to a hostile work environment

claim, but Ewing does not allege a hostile work environment in the Complaint and cannot use the summary judgment process to amend his complaint.   <u>Speer</u>, 123 F.3d at 665.   The Defendants are entitled to summary judgment on Ewing's claims.

<u>MELODY HOLMAN</u>

1.   <u>Hostile Work Environment</u>

Holman presents evidence that Officer Bridges made the comment in 1987 in front of her that an individual had to be black and female to get hired by the Department.  She heard another officer use the word "nigger" to refer to a suspect he was chasing.  Some Caucasian officers would stop talking when she came around.  Others, however, would talk to her, but not to Frazier.  Once Mark Houston yelled at her and told her to shut up, but he did not use racial epithets.  Holman heard many disparaging comments about Joy.  She heard the chicken-grease-on-the-steering-wheel reference once.  She also observed officers ignore Frazier and refuse to speak to Frazier.  Thus, from April 1987, to January 2003, Holman heard two racially hostile comments directed toward her, was involved in one incident of an officer yelling at her, and experienced some officers refusing to speak around her.  Refusing to speak does not create a hostile work environment,

and the other comments are too isolated and sporadic to demonstrate a claim for her of a pervasively hostile environment. <u>McKenzie</u>, 381 F.3d at 625; <u>Patt v. Family Health Systems, Inc.</u>, 280 F.3d 749, 754 (7th Cir. 2002). Holman heard other officers make comments about someone else and be mean to someone else. This second-hand hostile work environment is not as significant for hostile work environment analysis. <u>Adusumilli</u>, 164 F.3d at 362. When taken together, Holman fails to present evidence of a severe, pervasive, racially hostile work environment.

2.    <u>2001 Recruiter Position</u>

Holman also complains that she did not have the opportunity to apply for the full-time recruiter assignment. Holman asserts a claim of disparate treatment based on this lost opportunity. Holman presents no evidence that the recruiter assignment was a promotion. She held the same rank in either assignment. She presents no evidence that the recruiter position had greater responsibilities than her current assignment. Based on the evidence presented, the recruiter assignment would have been a lateral transfer, and a lateral transfer is not an adverse employment action. <u>Herrnreiter v. Chicago Housing Authority</u>, 315 F.3d 742, 745 (7th Cir. 2002). The loss of the lateral transfer opportunity, therefore, was not disparate treatment. The

Defendants are entitled to summary judgment on Holman's claims.

<u>CLEO MOORE</u>

1.     <u>Hostile Work Environment Claim</u>

Moore does not present evidence of a pervasively hostile work environment.   He presents evidence that Caucasian officers were disrespectful to Joy and Davis while the two of them were Sergeants.  Joy became a Lieutenant in 1999, and Davis became a Lieutenant in 2001. Moore heard disparaging comments about Joy.  He observed Caucasian officers bypassing Joy and Davis to go to Caucasian Sergeants.  Moore also states that he was shunned by Caucasian officers after the Black Guardians came out in support of Frazier in March 2002.[22]  Finally, Moore presents evidence that Assistant Chief Caldwell ignored him on a committee on off-duty work.  None of this constitutes a sufficiently pervasive hostile, abusive environment necessary for a claim of a hostile work environment.  <u>See</u> <u>McKenzie</u>, 381 F.3d at 625 (refusing to associate with or speak to a person is not a hostile work environment); <u>Adusumilli</u>, 164 F.3d at 362 (comments directed at others not as significant for hostile work environment analysis).

---

[22]The shunning could arguably constitute retaliation, but Moore does not allege these retaliatory acts in the Complaint and cannot amend his claims through his summary judgment brief.  <u>Speer</u>, 123 F.3d at 665.

2.      Disparate Treatment

Moore presents evidence that: (1) he applied for the bicycle patrol assignments, but the application was denied; and (2) he was disciplined for using mace in an emergency room.  He presents no evidence that the bicycle patrol assignment was a promotion.  He, therefore, presents no evidence that the denial of the assignment was an adverse employment action. Discipline also is normally not an adverse employment action, and he presents no evidence that this case was out of the norm.  He again fails to show that the discipline was an adverse employment action.    The Defendants are entitled to summary judgment on Moore's claims.

MUNICIPAL LIABILITY

Davis has shown that issues of fact exist on his §§ 1981 and 1983 disparate treatment claims based on the 1996 transfer from Criminal Investigations to Patrol and the rejection of his applications for transfer back to Criminal Investigations from 1997 to 2002.  He has not, however, presented evidence to show that there is a basis for municipal liability on these claims.   He, therefore, may only proceed against Chief Harris personally on these claims.

Normally, liability under §§ 1981 and 1983 is imposed personally on

the individual who committed the discriminatory act.  <u>See</u> <u>Auriemma v. Rice</u>, 957 F.2d 397 (7th Cir. 1992).  Liability will only be imposed on a municipality if the municipality is directly culpable for the actions.  A municipality is only culpable for the discriminatory or retaliatory actions of its employees if the actions were taken pursuant to official City policy or if the actions were taken as part of a custom or practice of the City that existed at the time of the incident.  <u>Calusinski v. Kruger</u>, 24 F.3d 931, 936 (7th Cir. 1994).  To be a custom or practice, the actions must be so widespread and pervasive that they amount to a practice that has the force of law.  <u>Gable</u>, 296 F.3d at 537; <u>Sims v. Mulcahy</u>, 902 F.2d 524, 542 (7th Cir. 1990).  To have the force of law, City policymakers must know of the custom or practice and be deliberately indifferent to the known or obvious consequences of the custom or practice.  <u>Gable</u>, 296 F.3d at 537-38.  The City policymakers are those who have the authority to adopt rules and conduct government, such as the Mayor or members of the City Council.  <u>Killinger v. Johnson</u>, 389 F.3d 765, 771 (7th Cir. 2004); <u>Auriemma</u>, 957 F.2d at 399-401.

The Plaintiffs have no evidence that the City had an official policy, pattern or custom of demoting or not promoting African American police

officers.  In fact, the evidence shows no pattern.  Davis, Joy, and Williams have been promoted several times from officer to Sergeant, to Lieutenant. In the case of Williams, he was promoted to Assistant Chief.  Davis' brother, Harvey, was Chief of Police in the mid-1990's.  Officer Harris, however, was not promoted to Sergeant in 2000, and Ewing's application for assignment as a Detective was denied four times.  Davis, Joy, and Harris complain that they were transferred to less desirable assignments and, in effect, demoted, but Ewing, Moore and Holman do not complain of any such treatment.  This evidence is, at best, ambiguous, and shows no particular pattern or custom of promotions or demotions for African American officers.

The Plaintiffs submit evidence that the Department has not increased the number of African American officers since 1981, and that the percentage of the Department's officers that are African Americans has dwindled, despite the fact that the City has an official policy of affirmative action and has set a goal of increasing the percentage of minority officers in the Department.  This evidence is insufficient for a number of reasons.  None of the evidence relates to transfers, promotions or demotions.  Davis does not allege discrimination in hiring; thus, the City's record of hiring African

American officers is not at issue.

The low number of African American officers in the Department, alone, also does not prove discrimination. The Plaintiffs have not presented any evidence of the number of qualified African Americans who applied to be officers, but were not hired during the time period from 1996 to 2002. Without evidence that qualified African Americans applied and were not hired, the low number of African American officers does not show that the City has discriminated against African American applicants. See Johal v. Little Lady Foods, Inc., 434 F.3d 943, 947 (7th Cir. 2006) (evidence of no minorities in management is not evidence of discrimination absent evidence of the qualifications of the individuals who were retained, hired, or demoted).

Mayor Hasara said in November 2002, that there was racism in the Department. That statement was a general statement about problems within the Department and does not establish that there was a pattern, practice or policy of discrimination in demotions or promotions that had the force of law. Gable, 296 F.3d at 537-38. The Plaintiffs have also presented extensive evidence about the current City administration's attitudes toward race and failure to recruit and retain African American police officers. The

current administration is not relevant to the time frame.  The issue is the custom, policy and practices of the Department from 1996 to 2002.  See Calusinski, 24 F.3d at 936.  Thus, the evidence about the current administration's efforts, or the lack thereof, is not relevant to this case.

The ineffectiveness of the City's efforts to recruit and retain more African American police officers does not, by itself, show a custom or practice of discrimination in hiring or retention.  The fact that the number of African American officers remains low does not show whether the City is trying, but failing to attract qualified African American applicants, or is discriminating against qualified African American applicants.  Again, the Plaintiffs presented no evidence on the number of African Americans who applied or wanted to apply and the qualifications of those individuals.  Without information on the qualifications of the individuals who were hired and individuals who were not hired, the Plaintiffs have not shown whether anyone interested in becoming a City police officer was discriminated against.  Johal, 434 F.3d at 947.  This evidence does not show that the City had a custom or practice of demoting and not promoting African American police officers that had the force of law.  Gable, 296 F.3d at 537-38.  The City is entitled to summary judgment on Count II.

105

THEREFORE, the Defendants' Motion for Summary Judgment (d/e 274) is ALLOWED in part, and DENIED in part.  The Motion is denied as to the following claims:

1.     Plaintiff Rickey Davis' Title VII claims in Count I against the City for: (1) disparate treatment and retaliation based on: (a) the 1996 transfer from Criminal Investigations to Patrol, and (b) the 1997 to 2002 denial of transfers to Criminal Investigations; and (2) retaliation based on: (a) the February 2001 reprimand, (b) the assignment to the third watch as a Lieutenant, and (c) the discipline in August 2002;

2.     Plaintiff Rickey Davis' §§ 1981 and 1983 claims in Count II against Chief Harris for disparate treatment based on: (a) the 1996 transfer from Criminal Investigations to Patrol, and (b) the 1997 to 2002 denial of transfers to Criminal Investigations; and

3.     Plaintiff Lea Joy's Title VII claims in Count I against the City for: (a) retaliation based on: (1) the 1996 transfer to the third watch, and (2) the transfer from IA to Field Operations; and (b) hostile work environment.

The remainder of the Motion is granted.  The Defendants are granted summary judgment on all other claims.  Plaintiffs Ralph Harris, Donald

Ewing, Melody Holman, and Cleo Moore are dismissed as parties to this action.

IT IS THEREFORE SO ORDERED.

ENTER:   November 14, 2006.

FOR THE COURT:

                         s/  Jeanne E. Scott
                         JEANNE E. SCOTT
                         UNITED STATES DISTRICT JUDGE